```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
       * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,          )  Criminal Action
                                   )  No. 21-MJ-14
vs.                                )
                                   )
ANTHIME JOSEPH GIONET,             )  June 4, 2021
                                   )  4:09 p.m.
              Defendant.           )  Washington, D.C.
       * * * * * * * * * * * * * * *
```

### _(All parties appearing via video and/or telephonically)_
### TRANSCRIPT OF PROCEEDINGS
### BEFORE THE HONORABLE G. MICHAEL HARVEY,
### UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

**APPEARANCES**:

```
FOR THE UNITED STATES:   CHRISTOPHER BROWN
                         United States Attorney's Office
                         for the District of Columbia
                         555 4th Street, NW
                         Washington, DC 20530
                         (202) 252-7153
                         Email: christopher.brown6@usdoj.gov

FOR THE DEFENDANT:       ZACHARY THORNLEY
                         1650 North Dysart Road, Suite 4
                         Goodyear, AZ 85395
                         (602) 686-5223
                         Email: courts@ThornleyLawFirm.com

                         JOSEPH A. SCROFANO
                         600 F Street, NW
                         Washington, DC 20004
                         (202) 870-0889
                         Email: jas@scrofanolaw.com

ALSO PRESENT:            JOHN COPES, U.S. Probation
                         REBECCA TIECHE, U.S. Probation
```

**Proceedings recorded by FTR Gold Electronic Recording Software.**
**Transcribed by stenographer via machine shorthand.**
**Transcript produced by computer-aided transcription.**
**Transcription is subject to the limitations associated**
**with technological difficulties.**

```
Transcriber:      Elizabeth Saint-Loth, RPR, FCRR
                  Official Court Reporter
```

1                           **P R O C E E D I N G S**

2                 THE COURT:  Good afternoon, this is Judge Harvey.

3                 Mr. Tran, please call the case.

4                 THE COURTROOM DEPUTY:  This is case 21-MJ-14,

5        United States of America versus Anthime Joseph Gionet.

6                 This is scheduled to be a status hearing held by

7        video.

8                 Would the parties please introduce themselves to

9        the Court, beginning with the government.

10                MR. BROWN:  Good afternoon, Your Honor.

11       AUSA Christopher Brown for the government.

12                MR. SCROFANO:  Good afternoon, Your Honor.

13       Joseph Scrofano, local counsel on behalf of Mr. Gionet.

14                MR. THORNLEY:  Arizona counsel, Attorney Zach

15       Thornley, on behalf of Anthime Gionet who is also present,

16       sitting next to me, Your Honor.

17                MR. COPES:  Good afternoon, Your Honor.

18       John Copes, Pretrial Services.

19                MS. TIECHE:  Good afternoon, Your Honor.

20       Officer Rebecca Tieche with Pretrial Services at the federal

21       courthouse in Phoenix.

22                THE COURT:  Good afternoon.

23                We're here because pretrial submitted a series of

24       reports.  I hope the parties have seen them; I think there's

25       two of them.  I hope everyone has seen both -- I have --

1    raising some concerns about Mr. Gionet's behavior while on

2    release in this case, requesting that his conditions of

3    release should be modified to include home detention,

4    notification of any contacts with law enforcement to

5    pretrial services, and to not possess any firearms or other

6    dangerous weapons.

7              So I will hear from pretrial; it's your

8    application.  Go right ahead, whoever wants to speak.

9    Perhaps the pretrial services officer from Arizona who knows

10   the most should address the Court.

11             MS. TIECHE:  Certainly, Your Honor.

12             I have not seen the reports that have been filed

13   with the Court.  We are providing courtesy supervision for

14   the charging district there in D.C.

15             Is there anything specific you have questions

16   about?

17             THE COURT:  No.  I mean, to you -- maybe it's

18   Mr. Copes; are you the one requesting that Mr. Gionet's

19   conditions of release be changed?

20             MR. COPES:  John Copes, Pretrial Services.

21             Yes, Your Honor.  PSA, Pretrial Services Agency,

22   for the District of Columbia is requesting a modification of

23   the defendant's release conditions due to the information

24   provided by the Arizona pretrial office.

25             The defendant has made several contacts with --

1    while under courtesy supervision in Arizona -- has made

2    several contacts within the past ten days with law

3    enforcement in Arizona to include Mesa Police Department.

4         The defendant -- the defendant's behavior is

5    concerning at this time.  I will kind of break down the

6    reasons for each request in the defendant's modification.

7         Defendant at this time does not have to report as

8    soon as possible to the pretrial services officer or a

9    supervising officer every contact with law enforcement

10   personnel, including arrests, questioning, or traffic stops.

11        In light of what's been occurring in Arizona, PSA

12   is making the request the defendant report those contacts

13   with law enforcement due to the contact -- due to the

14   defendant having multiple contacts with law enforcement

15   within the past ten days.

16        The defendant -- it is a national standard that

17   the -- when someone is being courtesy supervised from our

18   office to an office for the United States Probation or

19   pretrial office that the defendant does not possess a

20   firearm, destructive device, or other weapon.  At this time,

21   the defendant's release conditions consist of the defendant

22   to not illegally possess any firearms.

23        We believe that there is a safety issue due to the

24   defendant's recent behavior and what he has shown on the

25   video that there may be a concern for officer safety in

1     that:  If there is a need to visit the home of the

2     defendant, PSA is requesting that the defendant not possess

3     a firearm, destructive device, or other weapon due to a

4     concern for the safety of the supervising officer in

5     Arizona, or officers.

6          The defendant has made -- initially, when the

7     defendant was released, the defendant was placed on location

8     monitoring; and, since that time, the defendant was taken

9     off of location monitoring, I believe, on March 31st of this

10    year.

11         Due to the defendant's recent contact to include

12    after the ten o'clock hour and to include -- while the

13    defendant has been off of electronic monitoring -- location

14    monitoring -- defendant has had these contacts to include

15    the defendant appearing to give threats to an individual;

16    the defendant being in what appears to be an agitating

17    situation and having -- during those multiple contacts with

18    law enforcement, the defendant has also been trespass --

19    barred from going to a Starbucks in Arizona for

20    approximately one year as well.

21         So PSA feels that -- with the support of the

22    Arizona pretrial office, it is the recommendation that the

23    defendant be placed back on location monitoring so that he

24    may be monitored while he is in the community.

25         It appears not only from his contact but what is

1    shown on the video that has been provided to the Court that

2    the defendant appears to be a potential danger to the

3    community in this behavior that's been shown on the posted

4    YouTube video -- which brings me to the defendant's

5    modification of not posting videos to any social media

6    website to include video-sharing platforms.

7            It appears that the defendant is out in the

8    community as a video YouTuber individual that posts videos,

9    live videos.  And it appears that this -- that the

10   defendant, being a part of the video-sharing platform, being

11   part of recording and posting these videos -- it appears

12   that during these incidents that this is -- has the

13   defendant being a part of the situation that seems to

14   escalate from being what is supposed to be something

15   that's -- as the defendant may express, something that is

16   consistent with what is a YouTuber, or so.  It seems to

17   escalate to law enforcement or multiple law enforcement

18   contacts that are -- consists of situations that are -- that

19   escalate while he is out in the community.

20           PSA requests that those following modifications

21   that are also listed in the two reports that were

22   submitted -- one that was submitted on May 28th and the

23   other that was submitted earlier today -- that the

24   defendant -- PSA requests those modifications of the

25   defendant's release conditions.

1          THE COURT:  Mr. Copes, you mentioned the defendant

2     doing something out at 10:00 p.m. at night.  Does he have a

3     curfew?

4          MR. COPES:  The defendant does not have a curfew.

5          I noted that due to the request for GPS monitoring

6     and the hour of night that some of these incidents occurred.

7          THE COURT:  Mr. Copes, is anything in the

8     report -- or either of the reports you've submitted -- does

9     anything he did reflect a violation of his present

10    conditions of release?

11         MR. COPES:  No, Your Honor.

12         MS. TIECHE:  If I may -- pretrial services in the

13    District of Arizona would be happy to answer that question

14    if you are inclined.

15         THE COURT:  Go right ahead.

16         MS. TIECHE:  Thank you, Your Honor.

17         The District of Arizona initially reached out to

18    Officer Copes because the defendant was having such frequent

19    negative law enforcement contact.  And initially, when we

20    reached out to the officer in the charging district, we

21    acknowledged that these police contacts were not a direct

22    violation of his conditions of release but did appear to be

23    very concerning for the safety of the community.

24         And the videos that the defendant has posted --

25    and one he posted and I believe took down immediately

1    after -- but one, I think, has been submitted to the Court

2    to review.  It's clear to see his exploitation of the people

3    around him in these videos, people known to him and unknown

4    to him; and that his attempts are specifically to agitate,

5    anger, and offend and provoke a violent response to then

6    video during live stream for people to continue to comment

7    on throughout the live stream for people watching from

8    different viewing sources out and about.

9           And we just had concerns for safety of the

10   community as this behavior continues to go on at such a fast

11   rate.  He had three negative law enforcement contacts in a

12   span of six days; two of those law enforcement contacts

13   lasted throughout the night and involved more than one

14   police department having to respond.

15          And in the video, which I believe Your Honor can

16   see, the defendant is not showing himself but he is, in

17   fact, showing Mesa Police Department officers who are

18   responding to these scenes and he is playing songs for them

19   and singing to them and, again, attempting to evoke anger

20   and frustration from local police departments as well as

21   other law enforcement agencies that respond throughout that

22   area.

23          In Tempe, Arizona there are several law

24   enforcement agencies.  Just for the point of clarification,

25   there is Tempe Police Department -- and other Tempe

1    authorities are their title -- and those officers -- they're

2    tasked with just keeping the peace around a large college

3    town; and the defendant has had contact with that law

4    enforcement authority as well.  So that is why we initially

5    reached out to Officer Copes in attempt to minimize this

6    risk to the community that the defendant continues to

7    present.

8              THE COURT:  Okay.  Mr. Brown, what's the

9    government's position?

10             MR. BROWN:  Yes, Your Honor.

11             The government concurs in the recommendation of

12   pretrial services.  And I think it's important to note that

13   nobody -- no party here, Your Honor, is seeking to revoke

14   the defendant's pretrial release.  But pretrial services is

15   asking for, and what the government agrees, is an adjustment

16   in his conditions of release because this Court is required

17   to consider any condition or combination of conditions that,

18   among other things, will reasonably assure the safety of any

19   other person and the community.

20             And I think that it is clear that the defendant's

21   conduct where -- while possibly on the line of committing an

22   actual crime, certainly rises to the level of a clear

23   nuisance; there is an unsavory pattern to these interactions

24   with law enforcement.

25             And I do want to point out, Your Honor, that in

1     that video that was shared with the Court the defendant does

2     arguably -- there are moments where the defendant himself

3     arguably commits assault, assault and battery.  The

4     defendant engages in fighting words.

5              I won't read everything, but he does tell his

6     friend:  You're a [F'in] bitch.  Why don't you fight me like

7     a real man?  You are a [F'in] pussy, dude.  You [F'in]

8     bitch.  You dumb bitch, dude.  You're a pedophile.

9              The defendant then lunges towards his friend and

10    has to be separated from his friend by the other friend, the

11    one who is driving the car.

12             It's also significant, Your Honor, that in the

13    police report -- the police actually considered arresting

14    the defendant during his second interaction with law

15    enforcement on that first night for disorderly conduct due

16    to, quote, his combative behavior and words.

17             Now, I am not sure if -- I know the defendant has

18    not been charged, and it is arguable whether these are

19    actual violations of state or federal law, but it certainly

20    rises to the level of something that should trigger this

21    Court's concern entailing more restrictive conditions to

22    govern the conditions -- the defendant's pretrial release.

23             THE COURT:  Let me ask the pretrial services

24    officer from Arizona, are you -- you are doing courtesy

25    supervision, is that correct, of this defendant?

1              MS. TIECHE:  That is correct, Your Honor.

2              THE COURT:  And then do you do home visits in

3      Arizona?  I don't know what your practice is out there.

4              Do you ever go to the defendant's home?

5              MS. TIECHE:  We do.

6              Due to the COVID-19 health pandemic, we have

7      changed our in-district policies regarding in-home contact.

8      But should the Court be inclined to have more frequent

9      in-home contacts with the defendant, we can do that.

10             THE COURT:  Okay.  So that means during the

11     pandemic you have not been visiting this defendant's home;

12     is that correct?

13             MS. TIECHE:  I believe when he was on location

14     monitoring he did have officers at his home more frequently.

15     But once he was removed from location monitoring he came to

16     my caseload, as a generalist that supervises cases, that

17     would not require any special monitoring like location

18     monitoring or specific mental health treatment cases.

19             So given -- when he was reduced to my caseload, I

20     would say, was a reduction in supervision when he came off

21     of location monitoring.  A home visit has not been completed

22     since that time; and I believe that's been about two months.

23             THE COURT:  Okay.  I will hear from counsel for

24     the defendant.

25             MR. THORNLEY:  Your Honor, I believe that -- well,

1    I don't believe -- it's undisputed that there's not been any

2    violation of Mr. Gionet's release conditions.

3           I want to address just some of the things that

4    were discussed.  The -- Mr. Copes mentioned that it's a

5    natural standard not to possess a firearm; it may be, but

6    Mr. Gionet had not had a firearm restriction since the

7    beginning of this case.  I don't know -- nothing in any of

8    this has anything to do with a firearm, including the

9    charges that he faces there in D.C.

10          I am not sure exactly what the concern is for a

11   firearm; he has never been accused of misusing a firearm or

12   using a firearm in any kind of crime.  In fact, he does have

13   a firearm but it's not even at his house.  He removed it

14   just out of pure concern of not wanting to get in any

15   trouble or to violate anything even though there's no

16   restriction that he not have a firearm.

17          The mentioning of the negative police contacts is

18   concerning for me as a defense attorney and specifically in

19   regards to what has been requested here or what's been

20   proffered to the Court on the part of probation; it's

21   concerning to me because it's completely untrue.  The

22   contacts that he had were because he contacted police

23   himself after his friend had hit him, and that was it.

24          I believe other than the -- I think there was a

25   mention of a trespass from the Starbucks.  And in that case

1    the -- as soon as he was told that he couldn't go into

2    Starbucks or that he wasn't -- he couldn't stay in there, he

3    left.  After he left, he was standing outside --

4            THE COURT:  Yeah.  I thought he was barred,

5    meaning -- he went in, he played some song, offensive song,

6    and then they said you can't come back.

7            MR. THORNLEY:  That's exactly right.

8            THE COURT:  So now if he were to go back, well,

9    that might be trespass; but right now he has just been

10   barred because of whatever you want to call it -- offensive

11   conduct.

12           MR. THORNLEY:  That's exactly right, Your Honor.

13           So other than that, his -- he was the one that

14   made contact with officers.  He told officers what was going

15   on, that his friend had hit him.

16           That night -- you know, I am kind of rehashing

17   what's already in some of the responses back from myself

18   and -- I don't know if the state touched on it, but -- or

19   the government, but Mr. Gionet doesn't drink.  He doesn't

20   drink alcohol; he doesn't do drugs.  He is completely drug

21   free; he is alcohol free.  The driver of the vehicle that

22   night does not drink.  There was no drinking involved from

23   either Mr. Gionet or the driver.  The only person who was

24   drinking was the person that he ended up calling the cops on

25   who had actually hit him; that was the only person that was

1      drinking.

2              I just find it extremely concerning that because

3      someone may be offended by his behavior or what he does or

4      what he likes to do for work or for making money that we're

5      going to get hauled in to account for these things.  And

6      then, on top of that, there's the -- there's a request to

7      modify his conditions of release which I believe

8      wholeheartedly is a -- would be a direct violation of due

9      process; and I believe as such because, again, there is no

10     dispute that he didn't violate any conditions of release.

11     And I think that modifying anything based upon the fact that

12     he didn't violate anything violates his due process rights.

13             And, again, as I mentioned in my response, if he

14     does violate something at that time the Court has all of the

15     power to completely punish him or to have him held

16     accountable for whatever actions it is that he takes that he

17     is not supposed to do.  But it's completely incorrect to

18     hold him to a standard that was not even in place or that's

19     not part of his release conditions; it's really -- it's

20     really actually really ridiculous in my opinion.

21             I do want to address a couple of things in regards

22     to questions that the Court had for probation which is

23     whether or not there was any home visits.

24             Your Honor, in regards to his prior probation

25     officer, Mr. Justin Lauby -- I don't know if I pronounced

1    that correctly -- but he made visits twice a month every

2    month.  He made a total of ten visits to Mr. Gionet's home;

3    there was never an issue -- ever an issue.

4          The new probation officer has never visited his

5    home since then.  And so -- I mean, we're talking about both

6    probation officers throughout the entire duration within the

7    pandemic so this is not something that was outside of the

8    pandemic.  So I think if there were concerns about his

9    behavior or safety to the public that maybe there would have

10   been more visits to his house or something along those lines

11   to, I guess, check in on him for whatever reasons, I guess

12   probation has the right to do so.  So if there were concerns

13   about his safety they could have easily went in, checked his

14   house, checked to see if everything is legit or if

15   everything is cool, if he is behaving, if he is abiding by

16   the guidelines and the release conditions that are set forth

17   for him, but that's never been done with the new probation

18   officer.  And I would submit that there is a reason for

19   that, and the reason is that there has not been a concern;

20   if there was, she had every right to go follow through with

21   that.

22          The allegations that he is having contact with law

23   enforcement -- well, it's not illegal to have contact with

24   law enforcement.  For him it would be a bad thing obviously

25   if he is arrested, and he knows that that means bad things

1    for him if he is; and if he is, then he will account for

2    that at such a time.  But it is not illegal for him to --

3    and by the way, I feel like this request is almost a message

4    to him not to ever contact law enforcement if he needs to

5    contact law enforcement.

6            Mr. Gionet has fans, but he also has enemies; and

7    I think it would be a real detriment if he felt like he

8    could not contact law enforcement if he needed to for fear

9    that he is going to be hauled before the Court to account

10   for that contact with law enforcement.

11           With all that said, Your Honor, I also -- I would

12   rest on the arguments that I have submitted in my response.

13   I don't know if Mr. Scrofano would like to say a few words

14   as well.

15           THE COURT:  Mr. Thornley, I have a question for

16   you.  Does he have a job, or is his job making these videos?

17           MR. THORNLEY:  That is his job, Your Honor, and he

18   can speak to that more clearly than I can.

19           THE COURT:  Well, I don't need him to talk; I just

20   want to know.  The request here is that I prohibit him from

21   making YouTube videos.

22           MR. THORNLEY:  Yes.

23           THE COURT:  I don't know how that would impact his

24   livelihood.

25           THE DEFENDANT:  That's my income.

1          MR. THORNLEY:  It's -- it would cut off all of his

2     income; that's how he makes all of his income.  That's

3     how -- and that's what I was mentioning in my response, this

4     is something he has done for years.

5          This isn't something like he just started doing

6     out of the blue that he is like, hey, let me take up this

7     new thing, and it seems fun to do or something.  It's not

8     something that's a fun thing or -- well, I don't know, maybe

9     it's fun; but it's how he makes his money, and he has done

10    so for years.

11         How long -- how many years have you done -- when

12    did you start working for BuzzFeed?

13         THE DEFENDANT:  Five, six years ago.

14         MR. THORNLEY:  Okay.  So he has done it for quite

15    a while, Your Honor, and it's been the same thing that he

16    has done since that time, right?

17         Have you had anything --

18         So, yes, the request to cut him off from that

19    would be detrimental to him being able to earn a living.

20         THE COURT:  Okay.  Anything further from other

21    defense counsel?

22         MR. SCROFANO:  No, Your Honor.

23         THE COURT:  Government, any response?

24         MR. BROWN:  Your Honor, just a couple of points.

25         Regarding the defendant's ability to look to his

1   own safety by calling law enforcement when he feels himself

2   in danger, the defendant absolutely should feel free to call

3   the police if he is in danger, he should do that; we hope he

4   does.

5           I would just point out, in this situation, the

6   fact that he filmed the entire encounter both times and

7   monetized it by putting it up on YouTube and -- in fact,

8   during the video encounter -- or after the video encounter

9   with police but while still on camera, he admitted that it

10  was a mistake to call law enforcement; I think that all goes

11  to the point that this was not a situation where the

12  defendant legitimately felt himself to be in danger.  It was

13  a situation where the defendant was trying to create viral

14  content, and it creates a great deal of drama to have

15  unwitting law enforcement personnel be, if you will, extras

16  in the defendant's own narrative.

17          With respect to the alcohol issue, after reviewing

18  the video, the government agrees the defendant does not

19  appear to be inebriated.  I would point out however, Your

20  Honor, the defendant's friend whom the defendant believes

21  was inebriated -- towards the end of the video, that friend

22  comes over to the defendant's house, asks:  Hey, the cops

23  don't know what kind of car I drive, do they?  Did you tell

24  them by any chance?  The defendant says no.  The clear

25  implication is that this friend who is drunk is going to go

1     out in his car and he wants to make sure that the defendant

2     didn't tell the cops what kind of car the drunk friend

3     drives.  And then the defendant offers him a Steel

4     Reserve -- which is a malt liquor if you aren't familiar --

5     from the defendant's own refrigerator and then, later on in

6     the video, giggles with his other friend that that first

7     friend went out, quote, wasted in his own car.

8            So even if the defendant himself were not

9     inebriated, he's clearly abetting someone else's drunk

10    driving, in addition to all of the other really -- and

11    defense counsel has not addressed the defendant's own

12    conduct in that video.

13           The police officers believed the defendant was

14    acting as an instigator.  And I think you can trust your own

15    two eyes in watching that video, watching the defendant bait

16    and engage in fighting words and, at one point, lunge at his

17    friend.

18           You know, this is not a situation where I think we

19    need to worry about were the standards of conduct clear

20    ahead of time.  The standard of not engaging in assault and

21    battery, the standard of not engaging in egging on a friend

22    to drink and drive -- those standards are clear, and they

23    were included in his conditions of release.  And we're not

24    asking for him to be revoked and sent to jail; we're asking

25    for the Court to adjust his conditions of release to

1    reasonably assure the safety of the community.

2              THE COURT:  Okay.  Anything further, Mr. Thornley,

3    just to that last point about aiding and abetting --

4              MR. THORNLEY:  Yes.

5              THE COURT:  -- his friend to drunk drive?

6              MR. THORNLEY:  Yes, Your Honor.

7              It -- I believe that's completely untrue.  The

8    reason why I feel that way, Your Honor, is that when they

9    were originally stopped by police, he -- Mr. Gionet is the

10   one who informed officers that it was his friend who had

11   been drinking and could not drive.

12             Obviously they had a -- well, both Mr. -- as I

13   already mentioned, Mr. Gionet and the driver were both

14   sober.  So I don't think that, by any stretch of the

15   imagination, he is -- Mr. Gionet is okay with drinking and

16   driving; they didn't put the drunk guy behind the wheel that

17   night.

18             When his friend came back to the house I think

19   there was still a question of whether or not he was going to

20   stay.  And so whether or not he offered him a Steel Reserve

21   in my opinion is -- has no bearing on any of these issues.

22   It doesn't mean the guy was going to open it up -- if he

23   was, first of all.  And second of all, if he was going to

24   stay there, who cares if he continued -- if he offered him a

25   Steel Reserve and the guy continued to drink.

1          Additionally, and probably more importantly than

2    anything, Mr. Gionet is not responsible for someone getting

3    behind the wheel of their car after drinking and driving

4    unless it's he himself who does such an action.  So I think

5    that it's -- again, I think it's disingenuous to try to hold

6    him accountable for what this other drunk individual was

7    doing or did do.

8          The government mentioned something about -- that I

9    had not addressed his own conduct that night; that may be

10   partially correct.  But the reason why I didn't address the

11   majority of what they have discussed -- what probation and

12   the government has discussed -- is because of two things:

13   First, his conduct was not illegal that night and, secondly,

14   there was no violation of the release conditions.

15         Once again, I feel like a broken record.  I don't

16   know what I need to address in regards to his conduct

17   because there was no -- there was no violation; he is the

18   one that called the cops.  Nobody called the cops on him, so

19   I don't know why -- again, I really don't know why we're all

20   here today.

21         THE COURT:  Well, we're all here because your

22   client recorded all of this and put it up on YouTube, which

23   a smart person might wonder if that's what you should be

24   doing while you are under court supervision.  It's the rare

25   case that we can sit and talk about moment to moment what

1    you did and what you said; we can only do it here because

2    you recorded all of it and put it up on the internet.

3            I did see the 30-minute video; I thought it was

4    inane.  I did not see a violation of your conditions of

5    release.  You came close to committing crimes, but I didn't

6    see that either.

7            Nevertheless, the conduct that is of most concern

8    to pretrial is also of concern to this Court which is

9    that -- the conduct that night where you were essentially

10   baiting your friend, or whoever that other individual was,

11   which led to assault -- assault while you were inside of a

12   car.  I mean, you knew what you were doing; putting the

13   camera in his face; filming him; saying the things that you

14   were saying to him.  You wanted to get a rise out of him,

15   and you did; and you knew that he would respond in a violent

16   way, certainly the second time when you did it again -- in a

17   moving car.  That's dangerous conduct.

18           So this is what I am going to do.  I am going to

19   grant, in part, pretrial's request.  You are going to have

20   additional conditions of your release.

21           First, that you will report as soon as possible to

22   pretrial services officer -- the supervising officer every

23   contact with law enforcement personnel, including arrests,

24   questioning, or a traffic stop; that truly is a fairly

25   standard condition of release as is the next one which I am

1       going to impose on you.

2               You are not to possess any firearm, destructive

3       device, or other weapon; it sounds like you don't have one

4       in your house now, but you cannot have one in your house.  I

5       do that both because of this concern -- you seem to want to

6       provoke people to engage in assaultive conduct, that's what

7       I saw; so you should not have weapons.

8               I also am concerned if pretrial needs to visit

9       your home; you know it is the national standard.  D.C.

10      doesn't have home visits, other jurisdictions do; Arizona

11      does.  They may in the future, for you, as soon as the

12      pandemic is over, which is hopefully soon.  So you can't

13      have any guns in your possession or home.

14              The one good thing that I saw about the videos is

15      that you did seem to be concerned that you were on release.

16      At one point you said that you didn't want to actually get

17      in a fight; you wanted to avoid that because you knew that

18      that might have consequences in this case, so that was

19      smart.

20              But hopefully those two conditions -- especially

21      the one that says you have got to report any contact with

22      law enforcement -- will help you remember that you are on

23      release in this case.

24              I am not going to prohibit you from YouTube

25      videos -- making more videos at this time.  I will certainly

1    be reading closely any future reports from pretrial about

2    contacts with law enforcement, other incidents that they

3    think indicate you are danger to the community; I don't

4    think I am willing to change either that condition yet or

5    put you back under house arrest, but I will do that.

6          If you violate the law in the future, if you

7    engage in a fight in the future, if you are arrested in the

8    future -- I will certainly consider strongly putting you

9    back under house arrest or, in an appropriate case, having

10   you detained pretrial.

11         Mr. Gionet, do you understand all of that?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  Do you have any questions?

14         THE DEFENDANT:  No, Your Honor.

15         THE COURT:  All right.  I will be issuing an order

16   which will reflect the decision of the Court here.

17         Again, Mr. Gionet, you should feel free and you

18   should call the police -- I am not doing this because you

19   called the police that night; it was the conduct that led to

20   the assaultive conduct which required you to cause -- call

21   the police is what I am focused on.  But I also encourage

22   pretrial to let the Court know about future similar events

23   like this one; I don't have any problem with pretrial

24   raising these issues with the Court.  I will be looking

25   closely at this case in the future as reports are submitted.

1          Okay.  That's the ruling of the Court.  I will

2    issue an order changing your conditions of release as

3    reflected here.

4          The parties are excused.

5          MR. THORNLEY:  Your Honor, may I just get one

6    point of clarification?

7          THE COURT:  Yes.

8          MR. THORNLEY:  So it's not a violation of the

9    conditions if he does have additional contact with law

10   enforcement?

11         THE COURT:  No.  It's just that he has got to

12   report that to pretrial.  So every time -- every time you

13   have a contact -- whether it's just questioning, a stop, you

14   need to immediately report that to pretrial.

15         THE DEFENDANT:  I understand.

16         THE COURT:  Okay.

17         THE DEFENDANT:  Calling the cops, that's a

18   prank --

19         MR. THORNLEY:  I know.

20         Thank you, Your Honor.  I don't believe there is

21   anything --

22         THE COURT:  I don't know what that was all about,

23   calling the cops for a prank.  Any questioning -- any

24   contact with law enforcement, you need to report it.

25         MR. THORNLEY:  Let me clarify, Your Honor, since

1    you heard part of that.

2              So what happens is that on his streams oftentimes

3    people -- again, because he has fans and he has people who

4    don't like him very much -- people who don't like him will

5    follow his stream and then they will call the cops; they

6    will say things -- they will make false reports essentially

7    to law enforcement; then law enforcement comes to wherever

8    he is at and they believe that, you know, he has done

9    something lewd or he has done this or that -- that he

10   hasn't -- but he ends up inevitably having contact with law

11   enforcement.

12             THE COURT:  Then he will need to report it.

13             MR. THORNLEY:  Yeah.

14             THE COURT:  That's right.  You need to report that

15   to pretrial, and they can decide what to do with that.  You

16   can report it with an explanation report, and they can

17   decide whether or not to raise it with the Court or not.

18             MR. THORNLEY:  Thank you, Your Honor.

19             THE COURT:  Okay.  The parties are excused.

20             MR. THORNLEY:  Thank you.

21             THE DEFENDANT:  Thank you, Your Honor.

22             MR. COPES:  Thank you, Your Honor.

23             MS. TIECHE:  Thank you, Your Honor.

24             Officer Rebecca Tieche with pretrial services in

25   Arizona will exit the line.
                 (Whereupon, the proceeding concludes, 4:47 p.m.)

## CERTIFICATE

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of the FTR Gold software proceedings, and is a full, true, and complete transcript of the proceedings transcribed to the best of my ability.

**PLEASE NOTE:**  This hearing was held via videoconference and telephonically in compliance with the COVID-19 pandemic stay-safer-at-home recommendations and is therefore subject to the limitations associated with the use of technology, including but not limited to telephone signal interference, static, signal interruptions, and other restrictions and limitations associated with remote court reporting via telephone, speakerphone, and/or videoconferencing capabilities.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 21st day of July, 2021.

/s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter