**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-00132 (TNM)** |
| **v.** | : | |
| | : | |
| **ANTHIME GIONET,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Anthime Joseph Gionet to 75 days incarceration, followed by three years' probation, 60 hours of community service, and $500 in restitution.

## I.    Introduction

Defendant Anthime Joseph Gionet, a thirty-five year old, self-described "content creator and journalist", who is also known as "Baked Alaska",  participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on July 22, 2022, (ECF No. 64 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was  $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On July 22, 2022, when this case was assigned to District Judge Emmet G. Sullivan, defendant Gionet pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). On October 19, 2022, this case was reassigned to this Court. That same day, Gionet took to Twitter to celebrate the news, stating, "Huge news!!! Literal miracle just happened in my J6 sentencing[.] Will announce live on air today 5PM on Wake & Baked [.] Praise Jesus!!!!"

**Image 1**



5:11 PM · Oct 19, 2022 · TweetDeck

Later that day in his livestream, Gionet stated:

A literal miracle from God my attorney let me know. Judge Sullivan has officially recused himself from my case. He is no longer the judge in my case.

2

We don't know why and I've been reassigned to Judge McFadden who is a very awesome judge who is a pro Trump judge and one of the judges that let one of the guys off innocent in his trial. And that's the news!

**See Exhibit 1, which is a video of Gionet's October 19, 2022 livestream celebrating the transfer of this case from District Judge Emmet G. Sullivan to this Court.**

As explained herein, the government recommends a sentence of 75 days incarceration, followed by three years' probation, 60 hours of community service, and $500 in restitution. This is an appropriate sentence because Gionet (1) breached the Capitol twice and remained inside over an hour; (2) conducted a 27-minute long livestream video while in the Capitol showing the chaos there and attempted to profit from the video; (3) went into two Senate offices and filmed himself in one Senator's office using an office phone to pretend to call the Senate, urging that "[w]e need to get our boy, Donald J. Trump into office" and in the other office proclaiming, "[o]ccupy the Capitol, let's go, we ain't leaving this bitch," and "Patriots are in control"; (4) invited other rioters to enter the Capitol through a broken window; (5) yelled at a United States Capitol Police (USCP) Officer who tried to get Gionet to leave the Capitol, saying, "You're a fucking oathbreaker, you piece of shit, fuck you, fuck you, fuck you, you piece of shit, you broke your oath to the Constitution, fuck you"; and (6) was convicted of assault, disorderly conduct, and criminal trespass for a 2020 incident, and criminal damage in a separate 2020 incident.

The Court must also consider that Gionet's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who tried to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Gionet's crime support a sentence of 75 days

incarceration, followed by three years' probation, 60 hours of community service, and $500 in restitution.

## II.    Factual and Procedural Background

On January 6, 2021, Gionet was a thirty-three-year-old professional troll[2] engaged in increasingly provocative and criminal behavior in an apparent effort to drive online engagement and increase his notoriety and earning power.[3] In an article published nearly four years prior to the instant offense, Gionet was described as "a kind but often lonely social media genius . . . who had reinvented himself several times in his life in a desperate quest to fill the void of loneliness with fame and attention—irrespective of the cost." Oliver Darcy, Business Insider, *The untold story of Baked Alaska, a rapper turned BuzzFeed personality turned alt-right troll* (Apr 30, 2017, 7:59 PM) (available at https://www.businessinsider.com/who-is-baked-alaska-milo-mike-cernovich-alt-right-trump-2017-4). In fewer than four weeks, starting on December 11, 2020, Gionet went from having no prior arrests or convictions, to committing a series of notorious crimes, all of which were broadcast live to a large number of avid, encouraging, and paying followers. In the first

---

[2] "A troll is internet slang for a person who intentionally tries to instigate conflict, hostility, or arguments in an online social community. . . .  Trolls often use inflammatory messages to provoke emotional responses out of people, disrupting otherwise civil discussion." *What is trolling*? Goodwill Community Foundation (available at https://edu.gcfglobal.org/en/thenow/what-is-trolling/1/).

[3] Journalists have estimated that Gionet earned approximately $2,000 in tips during his livestream on January 6, 2021 alone.  Cassie Miller, Hannah Gais, and Megan Squire, Southern Poverty Law Center, "Funding Hate: How extremists like the ones who attacked the Capitol are making money off the internet (April 1, 2021) (available at https://www.splcenter.org/news/2021/04/01/funding-hate-how-extremists-ones-who-attacked-capitol-are-making-money-internet); *see also* Kellen Browning and Taylor Lorenz, New York Times, "Pro-Trump Mob Livestreamed Its Rampage, and Made Money Doing it" (Jan. 8, 2021, Updated 5:33 p.m. ET) (available at https://web.archive.org/web/20210109012306/https://www.nytimes.com/2021/01/08/technology/dlive-capitol-mob.html)

incident, Gionet provoked an individual into physically throwing him out of a restaurant and then sprayed oleoresin capsicum (pepper spray) into that individual's face. ECF 67 at 33. The entire interaction was posted on YouTube. Gionet would later be convicted of misdemeanor assault, disorderly conduct, and trespassing charges for his actions and be sentenced to 30 days incarceration and over $3,000 in fines. *Id*. at 32 - 34. The same month, while broadcasting live, Gionet tried to topple a menorah and tore down a Hanukkah sign displayed at the Arizona state capitol, declaring, "no more Happy Hanukkah, only Merry Christmas."[4] Associated Press, *Far-right personality known as 'Baked Alaska' charged with damaging Arizona State Hanukkah display*, (November 22, 2021) (available at https://www.fox10phoenix.com/news/far-right-personality-known-as-baked-alaska-charged-with-damaging-arizona-state-capitol-hanukkah-display); Angela Cordoba Perez, Arizona Republic, *Jan. 6 media streamer 'Baked Alaska' found guilty of damaging Hanukkah display*, (3:36 p.m. MT Oct. 25, 2022) (available at https://www.azcentral.com/story/news/local/arizona/2022/10/25/tim-baked-alaska-gionet-found-guilty-damaging-hanukkah-display/10590008002/). He was convicted of criminal damage and fined $300. *Id*. These performative criminal acts were a precursor to Gionet's most-watched criminal offense, his live stream from inside the United States Capitol less than a month later.

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 64 (Statement of Offense), at 1-7.

*Defendant Gionet's Role in the January 6, 2021 Attack on the Capitol*

---

[4] The draft Presentence Report in this case was finalized on October 1, 2022, with objections due on October 18, 2022.  Gionet appears to have pleaded guilty to the destruction of property charge on October 22, 2022 and received a fine.  This offense does not appear in the final Presentence Report, issued on October 31, 2022.

On January 5, 2021, Gionet traveled to Washington, D.C., from his home in Queen Creek, Arizona. That night, Gionet went to various places in D.C., including outside of the Black Lives Matter Plaza, and livestreamed individuals chanting against the police, Antifa, and Black Lives Matters. There, Gionet yelled repeatedly at the D.C. Metropolitan police, "Fuck the cops". He also livestreamed other individuals who lodged other obscenities at the police.  *See* Exhibit 2.

On January 6, Gionet livestreamed while he walked to the U.S. Capitol. As Gionet approached the east front of the U.S. Capitol, he broadcast on his livestream that he heard that people were storming the Capitol, and that Trump supporters were being pepper sprayed.  Gionet got to the east front of the Capitol but did not find anyone engaged with the police there.  He asked others who were there where the rioting was taking place. Some individuals there, and his audience watching his livestream, told him to go to the other side (the West front) of the Capitol. Gionet then yelled to those around him "calling all Patriots, other side, we need backup . . ."  Gionet said that he would "get as many people as I can." Gionet told others who were on the east front, "Hey Patriots, we need your help. Come to the other side of the Capitol. Let's go. The police are pepper spraying people." Instead of turning away, Gionet continued walking to the west front of the Capitol.  He also chastised the press that was there, called them the "fake news" and said they could "suck my fat white c*ck!" ***See* Exhibits 3 and 3a, which are videos depicting Gionet livestreaming while walking to and around the outside of the Capitol building engaged in the above activity.**

At approximately 2:35 p.jm. Gionet entered the U.S. Capitol through the Upper West Terrace emergency door and went to the Crypt.

**Image 2**



    *See* Exhibit 4, a screenshot of which is above in Image 2, consisting of CCTV depicting Gionet breaching the Capitol Building through the Upper West Terrace emergency door at approximately 2:35 p.m. while wearing sunglasses and a mask, which partially cover Gionet's face.

**Image 3**



***See*** **Exhibit 5, a screenshot of which is above in Image 3, depicting Gionet in the Crypt at approximately 2:47 p.m. as captured by CCTV.**

While inside the Capitol building during his first breach, Gionet recorded a 27-minute livestream video on the "DLive" platform.  He showed himself celebrating the breach of the Capitol to his more than 16,000 live followers. Gionet's followers' live chats were visible while Gionet livestreamed. Several of his followers applauded Gionet and the other rioters' illegal behavior. Some of these comments can be viewed in Exhibit 6.

**Image 4**



 *See* **Exhibit 6, a screenshot of which is above in Image 4, depicting Gionet in his livestream while in the Senate Wing celebrating with his fellow rioters.**

 As Gionet livestreamed, chaos reigned in the Senate Wing as rioters chanted, waved their flags, and flowed in and out of the Capitol through the Senate Wing door and windows.

9

**Image 5**



 *See* **Exhibit 7, a screenshot of which is above in Image 5, depicting Gionet in the Senate Wing celebrating with his fellow rioters and livestreaming the chaos there.**

**Image 6**



*See* **Exhibit 8, a screenshot of which is above in Image 9, depicting Gionet livestreaming rioters chanting, parading, and demonstrating in the Senate Wing.**

Gionet also captured rioters engaged in property destruction, including someone breaking a window to a door in the Senate Wing.

**Image 7**



*See* **Exhibit 9, a screenshot of which is above in Image 7, depicting a rioter breaking the wooden shutters and glass to the Senate Wing windows.**

A line of Capitol police officers stood in the hallway, blocking rioters from moving in one direction. Most of the officers were wearing riot helmets with plastic face shields lowered. Gionet stated to another rioter, "Hey, what do we got up here, riot police?" He also chanted slogans and made other statements including, "1776," "Fight for Trump," "Let's go, America First". *See* ECF No. 64 (Statement of Offense) at 9, 10. He also implored other rioters to, "Do not leave!" even as he witnessed and filmed the chaos, vandalized windows, destroyed furniture, and others leaving the building.

12

**Image 8**



**Image 9**



**Image 10**



*See* **Exhibit 10, screenshots of which are above in Images 8, 9, and 10, depicting Gionet livestreaming property destruction, Gionet imploring rioters not to leave the Capitol building, and rioters chanting.**

Gionet also approached a broken window next to a line of Capitol police. The glass panes had been smashed open by other rioters, and broken glass or other debris was visible on the windowsill. Gionet turned toward the broken window, facing outside where other rioters were standing, and stated, "Come in." *See* ECF No. 64 (Statement of Offense) at 11.

15

Gionet also chanted at the Capitol police, "Police are traitors! Police are traitors!" As he chants, one of his followers types in the live chat in all caps, "THIS IS A FEDERAL CRIME FYI!!! ENJOY PRISON!!!"

**Image 11**



*See* **Exhibit 11, a screenshot of which is above in Image 11, depicting Gionet livestreaming as he chants at the Capitol police, "Police are traitors! Police are traitors!"**

Gionet then entered Senator Jeffrey Merkley's hideaway office inside the Capitol building and interviewed other rioters who were there, commenting to one man who was in sunglasses and a fake beard[5] that "we got have thousands of people watching live . . ." Gionet also picked up a conference room telephone and filmed himself while pretending to make a call to the "U.S.

---

[5] Brandon Fellows, 21-cr-83-TNM

Senate," stating, among other things, "Hello U.S. Senate. We have a fraudulent election I would like to report. We need to get our boy, Donald J. Trump, into office," and "America First is inevitable, let's go, fuck globalists, let's go."

**Image 12**



**Image 13**



**Image 14**



***See*** **Exhibit 12, a screenshot of which is above in Images 12, 13, and 14, depicting Gionet entering a Senate office, interviewing rioters, and using a conference room phone and pretending to call the Senate.**

Gionet then entered a Senate conference room. He sat on a couch and placed his feet on a table. Gionet encouraged other rioters not to break anything. But he also led the rioters in chanting, "Whose House? Our House!" and stated, "Occupy the Capitol, let's go, we ain't leaving this bitch," and "Patriots are in control. . .  I told yall to trust the plan, did I not?"

**Image 15**



*See* **Exhibit 13, a screenshot of which is above in Image 15, depicting Gionet entering a Senate conference room, resting his feet on a table, and chanting with other rioters.**

Gionet eventually left the Senate office area and returned to section of the Senate Wing near the Senate Wing emergency exit door and started yelling "Whose House? Our House". The Capitol police who were present told Gionet and other adjacent rioters to leave the building. Instead of immediately doing so, Gionet lingered and continued to livestream. A Capitol police officer then ushered Gionet towards the exit, but Gionet accused the Capitol police officer of shoving him. Gionet directed an obscene hand gesture to the officer and yelled at him, "You're a fucking oathbreaker, you piece of shit, fuck you, fuck you, fuck you, you piece of shit, you broke your oath

19

to the Constitution, fuck you." Gionet was finally forced out of the Capitol building at approximately 3:17 p.m.

**Image 16**



*See* **Exhibit 14, a screenshot of which is above in Image 16, and which includes a video from Gionet's livestream depicting Gionet at the Senate Wing door berating a Capitol police officer as the police force Gionet out of the Capitol building at approximately 3:17 p.m.**

Image 17



**See Exhibit 15, a screenshot of which is above in Image 17, depicting Gionet on CCTV at the Senate Wing door berate a Capitol police officer as the police force Gionet out of the Capitol building at approximately 3:17 p.m.**

Gionet breached the Capitol building a second time by entering the Senate Wing door at approximately 3:25 p.m., approximately 8 minutes after he had been forced out of the building.

**Image 18**



    *See* **Exhibit 16, a screenshot of which is above in Image 18 depicting Gionet's second breach of the Capitol building on CCTV at the Senate Wing door at approximately 3:25 p.m.**

    Gionet remained inside the hallway among a crowd of rioters. A high-pitched, continuous alarm could be heard as Gionet continued to livestream. He announced, "We're back baby", chanted "fight for Trump" "Whose house? Our house!" He video recorded rioters entering the Capitol through the Senate Wing window, and yelled "Yeah" as a rioter repeatedly banged the frame of the window. He also began discussing with other rioters that a woman had been shot by the police.

**Image 19**



**Image 20**



*See* **Exhibit 17, a screenshot of which is above in Images 19 and 20, which depicts Gionet's livestream where he recorded rioters entering the Capitol, chanted "Fight for Trump", and "Whose House? Our House" and encouraged property destruction.**

Gionet finally exited the Capitol building the second time at approximately 3:40 p.m. being one of the last rioters to exit the Senate Wing, but still holding up his camera to livestream the action.

**Image 21**



*See* **Exhibit 18, a screenshot of which is above in Image 21, which depicts CCTV of Gionet exiting the Capitol building through the Senate Wing door, while continuing to record for his livestream.**

In total, Gionet spent nearly 67 minutes inside of the Capitol; from approximately 2:35 p.m. to 3:17 p.m. during his first breach and from 3:25 p.m. to 3:40 p.m. during his second breach. Gionet has admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so.

*Gionet's FBI Interview*

On September 23, 2022, pursuant to the requirements of the plea agreement, Gionet debriefed in an interview with the FBI.  Gionet reviewed a video that was recorded before the

January 6th riot (*See* https://www.dailydot.com/debug/baked-alaska-civil-war-video/) where he said that he was ready for a "civil war" and was "going home to get mine (guns)".   In that debriefing, Gionet claimed that he was joking about the guns, even though in the recording he said, "I ain't playing around."

During the debriefing, Gionet repeatedly claimed that his memory of what

happened on January 6 was "fuzzy". Gionet explained that on January 5, 2021, he was residing in Queen Creek, Arizona and flew from Phoenix to D.C and met his current roommate there. He was shown video of himself on January 5th and asked why he agreed and said ""Let's go" when someone he recorded suggested that they needed to go into the Capitol on January 6, 2021. Gionet claimed that he said "Let's go" only to keep the man talking. He also pointed out that the second time this man said let's go in the Capitol, Gionet responded "No" and  the crowd called the man a "Fed".

Gionet claimed that on January 6, 2021, he was self-employed and broadcast his livestreams through a platform named "DLive."  Viewers could send him money, called "lemons" in the trade. He said that viewers sent him approximately $2,000 related to his January 5th and 6th livestreams.  Gionet claims that he is in litigation with DLive because it withheld his $2,000 and suspended his account because of his actions on January 6.

Gionet claimed that on January 6th he had press credentials in Arizona but admitted  he did not have valid press credentials or any other credentials to go into the Capitol on January 6.

Gionet said that he "slept in" on January 6th at his hotel and saw on social media that former President, Donald Trump, was walking to the Capitol. He said those on his live chat told him to go to the Capitol because the police were pepper spraying people. Gionet said that he went to the Capitol via Uber.

Gionet explained that once he got inside of the Capitol , he was "caught up in the situation" and that he went into "various offices". He also claimed that when he yelled obscenities at the Capitol police officer in the Capitol he was mad because he believed that the officer pushed him.

*The Charges and Plea Agreement*

On January 7, 2021, the United States charged Gionet by criminal complaint with violating 18 U.S.C. § 1752(a)(1) and 40 U.S.C. 5104 (e)(2). On January 15, 2021, law enforcement officers arrested him in Houston, Texas. On April 19, 2022, the United States charged Gionet by a one - count Information with violating 40 U.S.C. § 5104(e)(2)(G). On July 22, 2022, pursuant to a plea agreement, Gionet pleaded guilty to Count One of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Gionet agreed to pay $500 in restitution to the Department of the Treasury.

## III.    Statutory Penalties

Gionet now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Gionet faces up to six months of imprisonment and a fine of up to $5,000. Gionet must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 75 days incarceration, followed by three years' probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a "grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Gionet's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Gionet, the absence of violent or destructive acts is not a mitigating factor. Had Gionet engaged in such conduct, he would have faced additional criminal charges.

Some of the most important factors in Gionet's case are that he entered into sensitive areas of the Capitol, he breached the Capitol twice, and he livestreamed and promoted to the public the violence that was occurring in the Capitol. Notably, Gionet entered two Senate offices used a

28

phone in one of the offices and then went to another Senate office, sat on a couch and put his feet up. There he proclaimed, "Occupy the Capitol, let's go, we ain't leaving this bitch," and "Patriots are in control." Gionet not only illegally occupied these offices but tried to make humorous a situation which could have ended in violence had Senate staffers been present in those offices or had the Capitol police responded there and made Gionet leave. To his credit, Gionet did ask rioters not to destroy anything while in those offices.

Furthermore, Gionet breached the Capitol twice. As the Capitol police ushered him out the first time, Gionet berated a Capitol police officer, but nonetheless breached that same area again after clearly being told to leave. With his two intrusions, Gionet occupied the Capitol for over an hour as law enforcement attempted to clear the Capitol of rioters.

Finally, Gionet livestreamed the violence in the Capitol to his followers and applauded the rioters' conduct. He even tried to profit off his recording of illegal activity and is in litigation to obtain $2,000 that he earned from his livestream. These actions show no remorse for his actions at the Capitol or those of his fellow rioters. Instead, Gionet seeks to profit from the footage that he recorded on January 6th.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 75 days incarceration, followed by three years' probation, 60 hours of community service, and $500 in restitution in this matter.

### B. The History and Characteristics of Gionet

As set forth in the PSR, Gionet's criminal history consists of the following three misdemeanor convictions stemming from an incident that occurred on December 11, 2020: 1) for assault—intent/reckless/injure; 2) disorderly conduct-fighting; and 3) criminal trespass. ECF 67 at 33. The PSR notes that the date of conviction is unknown. The event leading to these convictions

involved Gionet refusing to leave an establishment where he was filming for his YouTube channel and using the opportunity his provocation caused to pepper spray two people in the face. Gionet was sentenced to 30 days imprisonment pursuant to a January 13, 2022 Order of Confinement. Gionet has appealed his conviction.  Although not included in the Presentence Report, it appears that Gionet was also found guilty and sentenced on a single count of criminal damage on October 22, 2022, stemming from an incident at the Arizona state capitol in December 2020 as described *supra* at page 5 and 6.

Gionet reported to the PSR writer that he is a content creator and journalist – self-employed with Yoba, LLC.  ECF 67 at 74. He explained that he creates content in the form of livestreams and online videos.  Gionet has a bachelor's degree in marketing. ECF 67 at 68.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider. To that end, Gionet livestreamed the riot at the Capitol to over 16,000

of his followers, with some contributing money to him. A number of his followers also applauded his actions and those of the rioters. Due to the notoriety that he has cultivated, a significant sentence here that includes incarceration would provide general deterrence for anyone who would applaud or possibly repeat Gionet's actions.

*Specific Deterrence*

In the month leading up to and surrounding this offense, Gionet shamefully used his marketing skills to promote his own criminal acts so that he could build his profile and profit off his crimes. When he was told by his livestreamers of violence at the Capitol, Gionet went to the Capitol instead of staying away from a chaotic scene. He has admitted that he could not legally enter the Capitol, but that did not deter him from breaching it.

As he broadcast the violence at the Capitol to his many followers, he invited them to participate by following their suggestions and receiving donations from them. In doing so, despite his exhortations to the mob around him not to do damage, he became a cheerleader to a riot.

Gionet was ushered out of the Capitol, but that did not stop him from breaching the Capitol a second time. He also implored others not to leave the building; he berated the police, and entered two senate offices, going out of his way to demonstrate his lack of respect for the space where he was trespassing.

Gionet also livestreamed rioters illegally occupying the Capitol. Gionet stands before the Court having demonstrated a history of antagonism and provocation, with no apparent concern about profiting from his criminal conduct. Gionet has now livestreamed all three of his criminal convictions and, in one way or another, attempted to profit from them.  A significant sentence, which will deter Gionet from repeating this type of activity is therefore necessary.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[6] This Court must sentence Gionet based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Gionet has pleaded guilty to Count 1 of the Information, charging him with parading, demonstrating, and in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants

---

[6] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).

34

The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been

accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

One specific aggravating fact here is that Gionet livestreamed the riot, broadcast the violence at the Capitol, cheered it on, and sought to profit from it. In *United States v. Hargis-Getsinger, et al*, no. 1:21-cr-00607 (EGS) the defendants had someone follow them and that person livestreamed the defendants' approach to the Capitol and their actions just before they breached the doors of the Capitol building at the Rotunda doors.  Gov. Sentencing Mem., Hargis-Getsinger, 21-cr-54, ECF No. 51 at 6 - 11. They also went into a sensitive area of the Capitol, Congressman Kevin McCarthy's Office, but were only in it for 40 seconds. *Id*. at 19.  The Government requested a sentence of 45 days incarceration for both defendants. The Court sentenced both defendants to 60-days' incarceration, 3 years' probation, and 100 hours' of community service. Both defendants' criminal history category was one; they each had one dated (2008 and 2010) nonviolent misdemeanor, unlike Gionet whose convictions stem from a 2020 incident where he was violent. Gionet was also in two Senate offices for several minutes, not 40 seconds like the defendants in *Getsinger*. Gionet, unlike the *Getsinger* defendants, has also sought to profit from his livestreaming at the Capitol, a fact not present in the *Getsinger* case. All of these factors weigh in favor of a sentence of incarceration that exceeds the 60 days that Judge Sullivan imposed in the *Getsinger* case.

36

In *United States v. Jennifer Leigh Ryan*, 1:21-cr-0050 (CRC), the defendant, a self-described "influencer" who broadcasts over many social media platforms also participated in the January 6 riot and livestreamed her activity. Gov. Sentencing Mem., Ryan, 21-cr-50, ECF No. 48 at 1. Ryan, like Gionet, learned from her followers that a riot was taking place at the Capitol. She also chose to go to the Capitol and participate rather than stay away from the chaos there. *Id.* at 2. She breached the Capitol and joined in shouts to "Fight for Trump" before chemical irritants caused her to retreat from the building. *Id.* Although she left the building interior, she recorded herself outside and encouraged others to enter the Capitol. After the riot she participated in multiple interviews and showed no remorse for her actions and attempted to exploit her presence during the attack on the Capitol for profit by promoting her real estate business. *Id.* at 3-4. The Court sentenced Ryan to 60 days incarceration, a $1,000 fine. ECF. 56. Gionet's conduct in livestreaming the riot, promoting it, and seeking to profit from it rivals Ryan's conduct and warrants a similar sentence to Ryan. The court in the *Ryan* case did not impose probation or supervised release. Ryan had criminal history, but it consisted of remote misdemeanor convictions. Gov. Sentencing Mem., Ryan, 21-cr-50, ECF No. 48 at 5. Since December 2020, Gionet has engaged in a series of crimes resulting in convictions, which warrant a term of probation following incarceration.

Another case involving a defendant livestreaming the rioting at the Capitol is *United States v. Cameron*, no. 1:22-cr-17 (TFH). The defendant posted rioters scaling walls to reach the building. He, like Gionet, also filmed rioters taking over sensitive office space within the Capitol. Cameron also used his status as a "J6th defendant" and "political prisoner" to solicit thousands of dollars in donations for his "legal defense fund". The Court sentenced Cameron to 30 days' incarceration, 36 months' probation, a $1,000 fine, and $500 restitution. Gionet's conduct warrants

a significant prison sentence because he also filmed rioters in the Capitol, entered sensitive areas of the Capitol, and attempted to profit in the amount of $2,000 through his livestream of the riot and solicitation of "lemons" from his viewers. Gionet, like Cameron, also has used his status to solicit over $23,000 for the "Baked Alaska Legal Defense Fund" to help him "fight the globalist system against this insane political persecution". ECF No. 67 at 51. That would be a prosecution that Gionet has admitted his guilt to in this case.

Another aggravating fact here is that Gionet breached the Capitol twice. The court in *United States v. Bancroft*, no. 1:21-cr-271 (EGS) was also presented with those facts. There, the defendant twice unlawfully entered and remained inside of the Capitol, with her first breach occurring at 2:49 p.m. – just two minutes after other rioters breached the Senate Wing doors for the second time – and her second breach occurring a minute later. The defendant also deleted video she recorded inside of the Capitol but retained a video in which she claimed that she had been "looking for [Speaker of the House] Nancy  [Pelosi] to shoot her . . .". *See* Gov. Sentencing Mem., *United States v. Bancroft,* 21-cr-271 (EGS), ECF No. 55 at 2. The court sentenced defendant to 60 days incarceration and 36 months' probation.

Another significant factor weighing in favor of a significant term of imprisonment is that Gionet entered a sensitive area of the Capitol.  A defendant's entry into a sensitive space, such as the Senate Floor or a Member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people.

One of the most famous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk. *See* Amended Complaint, *United States v. Richard Barnett,* 21-

cr-38, ECF No. 3, at 2. That photograph has become notorious likely for exactly this reason, because of what invading the office of a member of Congress represents: a show of intimidation, an attempted display of power, above and beyond entering the building. As noted above, Gionet realized that he was in a sensitive area of the Capitol, but instead of leaving, he stated "we ain't leaving this bitch," and "Patriots are in control."

In *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pled guilty to misdemeanor charges of violating 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with penetrating the Capitol building all the way to the Speaker's Conference Room. Judge Boasberg sentenced each of the defendants to 45 days of incarceration. Amother misdemeanant who reached the Senate Floor, even though she does not appear to have known where she was, also received a sentence of incarceration. *United States v. Courtright*, No. 21-cr-72 (CRC) (30 days incarceration, one-year supervised release).

Like Jancart and Rau, Andrew Ericson went to the Speaker's Conference Room. He posed for a selfie there, as well as for as a photograph resting his feet on the conference table, just as Gionet did in a Senate office. Ericson also took a beer from a mini-fridge, while Gionet used a phone in a Senate office. *See* Gov. Sentencing Mem., *United States v. Ericson*, 21-cr-506 (TNM), ECF No. 37 at 3. Like Gionet, Ericson posted his involvement to social media. *Id.* at 4. Like Gionet, Ericson also was aware of the crowd outside. Gionet remarked to his livestreamers that "we have thousands of people watching live . . ." The government recommended 60 days' jail time, and this Court imposed a sentence of 20 days' imprisonment, discussing the defendant's entry into an office as follows: "That's a private area and your violation of that space suggests a certain brazenness and intentionality that requires consideration in your sentence. You could have caused a very dangerous and fearful scene had the speaker or her staff been present in the office when you and

others entered it." *Ericson,* Tr. 12/10/21 at 21. This Court concluded that entering offices put Ericson in a "different category" than people "who were only in areas that would normally be open for tours." *Id.*

In *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), the defendant pled guilty to a misdemeanor charge of violating 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating or picketing in a Capitol Building) in connection with spending time inside the Spouse's Lounge of the Capitol. While inside the Spouse's Lounge, Mazzocco, like Gionet, warned others not to take or destroy anything. Gov. Sentencing Mem., *Mazzocco*, 21-cr-54, ECF No. 28 at 6. Mazzocco took smirking photographs of himself during the riot. *Id.* at 2, 12. Gionet provided a livestream of his actions to the public. Judge Chutkan sentenced the defendant to 45 days of incarceration.

The government acknowledges that Matthew Buckler, entered Senator Merkely's hideaway office and watched as rioters smoked marijuana. Gov. Sentencing Mem., *United States v. Buckler*, 21-cr -162 (TNM), ECF No. 26, at 7. Buckler also breached the Capitol twice. *Id*. at 5. This Court sentenced Buckler to 24 months' probation, and 14 days of home confinement. Buckner, however, was only 19 years old and a high-school senior on January 6th *Id*. at 1, 14. Gionet was 33 years old and a college graduate. Buckner also had no criminal history. *Id*. at 14. By contrast, Gionet was recently convicted of assault—intent/reckless/injure, disorderly conduct-fighting, and criminal trespass, as well as criminal destruction, presenting a much different background than Buckner. These factors distinguish the instant case from *Buckler* and err for in favor of more significant sentence for Gionet.

The government also acknowledges that Felipe Marquez, who also entered Senator Merkley's office, received a sentence of three months' home detention; the government had recommended four months' incarceration. *United States v. Marquez,* 21-cr-136 (RC). Judge

Contreras, however, explained that Marquez's documented mental-health issues had a "significant influence" on his sentence, and believed that probation would best allow Marquez to receive mental-health treatment. *Marquez,* Tr. 12/10/21 at 32, 34, 37. One other defendant who entered Senator Merkley's office also received a probationary sentence, but he was a 68-year-old retiree with no criminal record who was there for less than a minute, and there was no evidence that he engaged in any flagrant conduct while there. *See United States v. Edwards,* 21-cr-366 (JEB).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *see, e.g.*, *United States v. Little*, 21cr315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of

this case), appeal pending, D.C. Circuit No. 22-3018; *United States v. Sarko*, No. 21cr591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. 21cr342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21cr290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21cr630 (CJN), ECF 37 (D.D.C. April 22, 2022) (same); *United States v. Entrekin*, 21cr686 (FYP), ECF 34 (D.D.C. May 6, 2022) (same); *United States v. Revlett*, 21cr281 (JEB), ECF 46 (D.D.C. July 7, 2022) (same); *United States v. Getsinger*, 21cr607 (EGS), ECF 60 (D.D.C. July 12, 2022) (same); *United States v. Ticas*, 21cr601 (JDB), ECF 40 (D.D.C. July 15, 2022) (same); *United States v. Caplinger*, 21cr342 (PLF), ECF 74 (D.D.C. August 1, 2022) (same): *United States v. Ferreira*, 22cr210 (TSC) (D.D.C. October 6, 2022) (same).[7] In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

## I.      A sentence imposed for a petty offense may include both incarceration and probation.

### A.   Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989)

---

[7] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

(noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).   Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[8] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[9] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different

---

[8] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10).  *See* Part II *infra*.

[9] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

### B.  *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of

44

supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless." *Little*, 2022 WL 768685, at *4. But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.*

45

at 808.   In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation."   *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense."   *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense").   Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense."   The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense."   *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012).   Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited."   *Id.* at 148-49.   And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article

46

before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart

47

from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two

offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  Gionet pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

## II.     A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

### A.  *Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[10]

### B.  Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous

---

[10] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[11]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

## III.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 75 days incarceration, followed by three years' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

---

[11] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:    /s/ Anthony L. Franks
ANTHONY L. FRANKS
Assistant United States Attorney
Bar No. 50217MO
555 Fourth Street, N.W., Room
Washington, DC  20530
anthony.franks@usdoj.gov
(314) 539-3995

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2022, I caused a copy of the foregoing motion to be

served on counsel of record via electronic filing.

*/s/ Anthony L. Franks*
Anthony L. Franks
Assistant United States Attorney

52