# UNITED STATES DISTICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

 

ANTHIME GIONET,

          Defendant.

**1:22-CR-00132 (TNM)**

**SENTENCING: JANUARY 10, 2023**

## ANTHIME GIONET'S SENTENCING MEMORANDUM

Defendant, Anthime Gionet, through counsel, respectfully submits to the Court the Defendant's sentencing memorandum. Defendant has accepted responsibility for picketing inside the Capitol, a violation of 40 U.S.C. § 5104(e)(2)(G) which is a misdemeanor under federal code. Defendant requests a fair sentence in comity with what others similarly situated with this same charge have been sentenced to. We respectfully request credit for time served and a term of 12 months of probation.

## I.    Introduction

Mr. Gionet was in Washington DC on January 5th and 6th of 2021. He often travels around to document controversial protests or rallies. He has an extensive

1

history of doing so.  He is a supporter of former President Donald Trump and that possibly made this trip more exciting.  However, his decision to go to Washington DC was made with the same motivation he has had with all other events he has documented.  Mr. Gionet had no intention of going into the Capitol building although he did eventually find himself inside on the 6th. On January 5, 2021, while documenting some of the unrest on the streets of Washington DC, Mr. Gionet was being followed by a man named Ray Epps.  Epps vehemently tried to convince Trump supporters on the street that night that they should all march on and enter the Capitol building.

Mr. Gionet is adept in street interviews and knows that when someone says something "out-there" he doesn't just shut them down.  Gionet may say words encouraging the person to keep talking.  On this instance, Mr. Epps says to Mr. Gionet while Mr. Gionet is holding his camera, "…in fact tomorrow, I don't even like to say it cause I'll be arrested. We need to go in to the Capitol" while looking directly at Mr. Gionet.   Mr. Gionet then says, "Let's go."[12]  It should be noted that "Lets go" is a phrase that Mr. Gionet uses on a frequent basis and can be heard throughout nearly any of his hundreds of livestreams.

_____

[1] See Figure 1 below.
[2] See Also Exhibit 1, First interaction with Epps.



Figure 1[3]

---

[3] Mr. Gionet interviewing Ray Epps January 5, 2021.

Further in Mr. Gionet's footage, again Epps says, "I'm  gonna[sic] put it out there, I'm probably gonna[sic] go to jail, tomorrow, we need to go into the Capitol.  This time, Mr, Gionet says, "What, no." and began to yell, "Fed Fed Fed Fed."  See Figure 2 below.



Figure 2[45]

---

4  Exhibit 2, Gionet, Second interaction with Epps
5 Exhibit 3, Gionet, mixed video of both interactions

Mr. Gionet awoke the following day late due to being up late the prior evening.  President Trump was already speaking.  Mr. Gionet took an uber and was dropped near the Capitol building and wandered to the Capitol by himself near the East Plaza while documenting via livestream as he typically did.  He had no idea that Epps had actually led the charge and really did direct people to the Capitol.  Shortly thereafter Epps is literally at the gate where the first breach takes place whispering into another person's ear and then the gates are yanked down.  See Figure 3 below.  Mr. Epps was never charged and was removed from the FBI's most wanted list despite all of the above.



Figure 3

Mr. Gionet had no idea that anyone had entered the Capitol when he first arrived.[6]  Viewers of his live stream knew more about what was happening in the lower west plaza and the upper west terrace then Mr. Gionet did, and they began to inform him that there was something more interesting to document on the other side of the Capitol.  He then made his way to the West side of the Capitol.

When he arrived, there was no law enforcement presence.  There were no barriers in place.  Mr. Gionet's livestream footage didn't have a good signal as he walked up to the Capitol, and it cut out.  However, Capitol cameras catch Mr. Gionet walking into the Capitol through an open door.

---

[6] See Exhibit 4 (Dlive Livestream Footage first arriving at Capitol).



Figure 4

Once through the first door, it appears that at least one officer is holding

the door open for Mr. Gionet and many others at a second set of doors.[7]

_____

[7] Exhibit 5 - Capitol surveillance of Mr. Gionet walking in.



Figure 5[8]

It is clear that at the moment Mr. Gionet entered the Capitol, Capitol law enforcement, at least in this area, was not telling anyone to leave, trying to hold people back, or attempting to prevent entry.  Neither was Mr. Gionet violent nor was his entry.  Video shows he is walking with a selfie stick and his camera to document the situation as he typically would like in most other settings.  It is

---

[8] Exhibit 6 Capitol surveillance of second set of doors where Mr. Gionet entered.

important to note that not one person, law enforcement or otherwise tell Mr. Gionet he is not welcome. No one tells him he must leave. He entered with law enforcement holding the door open for him. Further, once inside, Mr. Gionet speaks with several officers, some of whom fist bump him or shake his hand.[9]

Also, while inside, Mr. Gionet tells others not to break or vandalize the building. He does this on several occasions.[10] Officers eventually direct Mr. Gionet to the door and he makes his way that direction. An officer decided to shove Mr. Gionet while he is on his way out, and after entering the building with officers holding the door, being in the building with no one telling him to leave, fist bumping with other officers in the building, and not resisting leaving the building he yelled at the officer who shoved him but didn't fight or shove back nor resist and continued leaving as directed. Mr. Gionet came with no "gear" for being combative with law enforcement. Others in the variety of January 6th videos are wearing gas masks, military type helmets, protective gear. Mr. Gionet is just armed with his phone as he aways has been.

---

[9] Exhibit 7 - Dlive footage of Mr. Gionet fist bumping a Capitol Officer.
[10] Exhibit 7 - Dlive footage of Mr. Gionet telling others not to break or vandalize the Capitol.

Mr. Gionet did step into two offices while in the Capitol.   And the Government asserts that it was about a display of power.   But if you watch the video of Mr. Gionet's livestream that he himself films, Mr. Gionet is being lighthearted and making jokes.   To be sure, a look back onto the day in question quickly reveals that the jokes and the time in the Capitol wasn't funny.   But Mr. Gionet's actions must be viewed in the correct context if he is to receive a just sentence and neither power nor aggression was atop Mr. Gionet's mind or his actions on that day.

## II.    Mr. Gionet's Background

At the inception of the charges in this matter, Mr. Gionet had no criminal history.   In October of 2020, Mr. Gionet was charged with 3 misdemeanors. Nearly a year later, and well after this matter was filed, he was found guilty at trial. In a separate matter that stemmed from December of 2020 charges were not filed until around December of 2021.   After a trial, Mr. Gionet was found guilty of 2 misdemeanors.   Since the charges in this case, Mr. Gionet has changed many aspects of his life.   As mentioned throughout this memorandum, his compliance on federal pretrial probation is the best indicator that he has understands the need for the changes he has made.   Mr. Gionet doesn't have a life long criminal history or a history of being a troubled individual.   Mr. Gionet's recent legal issues stem

not from mental health or drug and alcohol abuse. They are a direct result of some poor choices. Mr. Gionet has made a concerted and deliberate effort since this incident and has proven that he understands the gravity of the situation and has abided faithfully by all of his pretrial release conditions. Mr. Gionet was one of the first arrested after January 6, 2021. He was arrested on January 15, 2021. He was released five days later. Since January 19, 2021, Mr. Gionet has followed all of his release conditions.

Obviously, Mr. Gionet's compliance is expected by the court and as such, he doesn't get a proverbial "cookie" for doing what he is supposed to do. But it is noteworthy that many do not respect or follow their release conditions. In Mr. Gionet's case, at the time of sentencing it will nearly be two full years that have passed since the time of his arrest and subsequent release, and it absolutely should be a consideration for a just sentence that Mr. Gionet has faithfully and without wavering, followed all directives by the court and by his probation officers. Those of us who actively work within the justice system take for granted that the entire pretrial process is a form of punishment for a defendant. Two years is a great deal of time to be on pretrial release for a misdemeanor in any jurisdiction.    A more

11

detailed review of Mr. Gionet's upbringing. background and mitigation can be found in Exhibit 7.[11]

### III.   A Comparison of Those Who Received 75 Days of Incarceration or More and the Need To Avoid Sentencing Disparities.

The Governments requested sentence doesn't match facts as compared to those who received such sentences of incarceration.  The number of defendants sentenced changes on a daily basis so these number may not be exact but as close to exact as possible based upon the most recent sentencing chart.[12]  Of those who received seventy-five days or more of incarceration as a direct result of a plea to the same charge as Mr. Gionet only nine defendants have received such a sentence.

Of those nine, a common theme emerges after a close review of each case. Most of those instances involve lying to the FBI during their interview, having an extensive criminal history, violating their pretrial release conditions, being involved with crowds who pushed on police lines, or entering the Capitol through broken windows to name a few.  None of which apply to Mr. Gionet.  Others who

---

[11] Exhibit 8 – Mitigation Memorandum, Chronicle Sentencing Services, Tamara James, (12/02/22).
[12]  Sentencing Chart 11/14/22

pled to more serious charges are the only other instances where 75+ days of incarceration was order.  Some specific examples are outlined below.

## A. **Kenneth Rader – 1:22-cr-00057-RCL**

Mr. Rader pled guilty to 40 U.S.C. § 5140(e)(2)(G).  Kenneth Rader received a 90-day sentence.  Mr. Rader had an extensive criminal history according to the government's sentencing memorandum in that matter. Additionally, while he was on release used meth on several occasions, he failed to report to drug testing, he failed to timely appear to another court case he had that resulted in a bench warrant.  All in all, the government noted that Mr. Rader had at least 23 prior criminal convictions.

*Rader's Conduct While on Release*

On pretrial release in this case since January 27, 2022, Rader has used methamphetamine multiple times since at least June 22, 2022. ECF No. 30 ("PSR") at ¶ 90. He left inpatient treatment

9

on that date, failed to report to outpatient treatment, and repeatedly failed to appear for drug testing by Pretrial Services. *Id.*; *see also id.* at ¶ 6. Rader also failed to timely appear in state court in Elk Point, South Dakota, on July 21, 2022, resulting in the issuance of a bench warrant and his detention. *Id.*

Figure 6[13]

---

[13] *U.S. v. Rader*, 1:22-cr-00057-RCL, Govt. Sent. Memo, (09/02/22)  p.9-10.

> ### B. The History and Characteristics of Rader
>
> Rader's extensive criminal history and his violations of the conditions of release in this case counsel in favor of a sentence of imprisonment. Rader, age 54, has been convicted of crimes on 23 occasions; he has been convicted of an offense almost every two or three years since he was 17 years old, including a criminal mischief conviction within the last year for damaging someone's crops. *See* PSR at ¶¶ 32-54. For example, Rader has multiple convictions for theft and burglary offenses, assaultive conduct,[5] controlled substance offenses,[6] failures to report to custody, and intoxicated driving. He currently stands charged in Union County, South Dakota, with allegedly stalking and trespassing on the property of his former girlfriend in October and November 2021. *Id.* at ¶ 64. Courts have found Rader in violation of parole or probation conditions at least seven times.[7] In addition to his lengthy record of convictions and parole and probation violations, Rader

> also has been arrested an additional 11 times as an adult, although the charges were dismissed. *Id.* at ¶¶ 57-66. Rader's lengthy, unrelenting history of criminal conduct, including multiple parole and probation violations, demonstrates his complete disregard for the law and underscores the need for the custodial sentence urged here by the government.

Figure 7[14]

Unlike Mr. Rader and as noted above, Mr. Gionet has taken all of his time on pretrial probation seriously.  Mr. Gionet's other convictions for misdemeanors

---

[14] *U.S. v. Rader*, 1:22-cr-00057-RCL, Govt. Sent. Memo, (09/02/22)  p.14-15.

stemmed from incidents within a two- or three-month period immediately preceding January 6, 2021, and since January 6, 2021, Mr. Gionet has not only kept out of trouble and followed all directives, but he has made major changes in the way he provides livestream content. The changes to how he creates content keep him off the streets and away from the intense emotionally charged situations he had previously found himself in.

**B. Jeffrey Smith – 1:21-cr-00290-RBW**

Mr. Smith pled guilty to 40 U.S.C. § 5140(e)(2)(G). Mr. Smith was sentenced to 90 days. Mr. Smith was alleged to have "led the charge" removing barricades inside the rotunda. Mr. Smith assisted with pushing officers from doors or overwhelming them triggering the first and only major breach point on the east side of the Capitol. He led rioters upstairs and his pre-January 6th communications revealed that he had planned to go into the Capitol. He also deleted evidence from his phone.

and destructive rioters.  Although three police officers initially prevented him from opening the doors, Smith returned to the Rotunda doors to assist a growing mass of rioters in overwhelming the officers by sandwiching them against the doors which caused the doors to open from the inside and triggering the first and only major breach point on the east side of the Capitol (confirmed by the Capitol Police).  This allowed the large mob to enter the Capitol that police had managed to repel a few minutes before, now compromising the Capitol on both the east and west sides.  Smith then led those rioters upstairs.  Far from being a follower simply caught up in the crowd, Smith— a former Army sergeant—quite literally led the charge to open the Rotunda doors from the inside to let in a violent mob clearly visible to him through the damaged door windows on the outside.

Figure 8[15]

Mr. Gionet led no charge.  As is seen on the Capitol surveillance, Mr. Gionet walked in with an officer quite literally holding the door for him.  Mr. Gionet pushed no one, shoved no one, and discouraged destruction and vandalism while inside the Capitol.  At no time did Mr. Gionet touch or remove barricades. Mr. Gionet is also not being accused of deleting or destroying evidence as Mr. Smith was.  Additionally, Mr. Gionet's footage from his live stream was used extensively by the FBI for many of the mugshots posted for wanted persons after January 6, 2021.

---

[15] *U.S. v. Smith*, 1:21-cr-00290-RBW, Govt's Sent. Memo, (02/18/22), p.2.

C. **Adam Johnson – 1:21-cr-648-RBW**

Mr. Johnson was sentenced to 75 days.  However, Mr. Johnson pled to a more serious crime (Class A misdemeanor) of one count of 18 U.S.C. § 1752(a)(1) which carried a possibility of up to one year in jail.  Mr. Johnson climbed scaffolding outside the Capitol to enter the Capitol.  He located the Speakers podium and carried it to the Rotunda in what became a viral photo of that day.



Figure 9

While in the Capitol Mr. Johnson found himself in a crowd that was actively pushing a police line blocking the House floor.  Additionally, Mr. Johnson deleted

18

media and images from his phone and facebook in an effort to avoid getting in trouble.

circumstances in this case.  In particular, Johnson: (1) ran towards the Capitol after hearing it had

1

been breached; (2) recorded a video of rioters assaulting and disarming police officers outside the Capitol; (3) witnessed officers use tear gas and flash bang devices to disperse the crowd and yet persisted in breaching the Capitol through the Senate Wing Door, alongside rioters who were entering through a smashed window; (4) ascended a staircase to the second floor and traveled all the way to the doors to the House Chamber; (5) tried to open a door he believed was to Speaker Pelosi's office, shortly after her staffers had barricaded themselves against the mob just across the hall; (6) temporarily stole and carried the Speaker's podium to the Rotunda for a "photo op"; (7) formed part of a mob that overwhelmed a line of police guarding the entryway to the House Chamber and crushed officers during its advance; (8) witnessed rioters attempt to break down the doors to the House Chamber and encouraged them to do so by shouting that a bust of George Washington would make "a great battering ram"; and (9) destroyed evidence by deleting videos and photographs from his cell phone as well as his entire Facebook account.

Figure 10[16]

---

[16] *U.S. v. Johnson*, 1:21-cr-00648-RBW,  Govt's Sent. Memo, (02/18/22), p.1-2.

19

Here, first, Mr. Gionet is pleading to a Class B misdemeanor with a possible maximum term of 6 months not the more serious Class A misdemeanor Mr. Johnson pled to.   Additionally, as previously noted and as shown on Capitol surveillance, Mr. Gionet was never climbing walls or scaffolding as Mr. Johnson was.   Mr. Gionet never moved any items in the Capitol or walked away with artifacts found in the Capitol as Mr. Johnson did.   Further, Mr. Gionet never participated in any use of force against any officer, neither as a single individual nor as part of a crowd.    And once more, Mr. Gionet never deleted images or videos as Mr. Johnson did in his active decision to destroy evidence.

### D. Jenny Cudd – 1:21-cr-00068-TNM

Ms. Cudd pled guilty to the same charge and class misdemeanor as Mr. Johnson above, 18 U.S.C. § 1752(a)(1) .   In Ms. Cudd's case the government requested 75 days from this Court for the very same charge Mr. Johnson had.   This Court sentenced Ms. Cudd to 2 months of probation.

Ms. Cudd, like Mr. Gionet walked through the same exact door when entering the Capitol.   In fact, it appears from the photo the government used in their sentencing memorandum that Ms. Cudd and Mr. Gionet entered that same spot within seconds or maybe a couple of minutes of each other.



Figure 11

Unlike Mr. Gionet's entry, however, Cudd admitted or made statements that she had to scale a wall to get to the entry door.  Mr. Gionet never scaled any walls.  He simply walked up the steps.  He could not have scaled a wall with his selfie stick in one hand.  Also, Cudd wore a bulletproof sweatshirt at the rally and while entering the Capitol.  Mr. Gionet had a hooded sweatshirt (hoody) but it was not bulletproof.  Both Ms. Cudd and Mr. Gionet yelled at others who were trying to break or destroy property.

### E. Andrew Griswold – 1:21-cr-00459-CRC

Mr. Griswold pled guilty to 18 U.S.C. § 231(a)(3).  Mr. Griswold was sentenced to 75 days in jail.  But Mr. Griswold pled guilty to a felony, facing up to 5 years in prison.   Here, Mr. Gionet is pleading to a misdemeanor with a possible maximum of six months.  Mr. Griswold was accused of pushing his way into the Capitol past police officers.  Mr. Griswold also climbed stairs once inside and found his way to the doors of the Senate Gallery where he entered.  Although allowable by law it cannot be equivocal that Mr. Gionet pleas to a misdemeanor, admitting to protesting or picketing in the Capitol yet receives a similar sentence to a defendant who pled to a felony.  The government alleges that Mr. Griswold, like some of the others with larger sentences of incarceration, erased or deleted photos and/or videos.

### F. Robert Packer – 1:21-cr-00103-CJN

Mr. Packer pled to 40 U.S.C. § 5140(e)(2)(G) like Mr. Gionet.  Mr. Packer received a 75-day sentence.  Unlike Mr. Gionet, Mr. Packer was alleged to have entered the Capitol shortly after the breach in which certain rioters smashed in a window with a law enforcement plastic shield.  He was alleged to have seen all the police barricades and walked past them.  In Mr. Gionet's case, the barricades were long removed by the time he arrived at the western terrace.  Also, unlike Mr.

Packer, Mr. Gionet was not in the area in which Ashley Babbit was shot and killed. Additionally, Mr. Packer has a criminal record "17 pages" long according to the government's sentencing memorandum. *U.S. v. Packer*, 1:21-cr-00103-CJN, Govt. Sent. Memo, (05/16/22), p.29.   Mr. Packer's criminal history spans 25 years with over 21 convictions.   The government also alleged that Mr. Packer was in the crowd as rioters in the statutory hall connector pushed past the police line into the house side of the Capitol.   Mr. Gionet neither has such a criminal history nor had he participated in crowd activity to shove officers.

### G. Jeffrey Register – 1:21-cr-00349-TJK

Mr. Register pled guilty to 40 U.S.C. § 5140(e)(2)(G) like Mr. Gionet. Mr. Register received a sentence of 75 days.   Unlike Mr. Gionet, Mr. Registers facts are quite different.   Register lied to the FBI when he denied entering the Capitol.

the scaffolding. Shortly thereafter he saw law enforcement shooting what
appeared to be pepperballs and OC spray at the advancing crowd. REGISTER
stated that he was not a part of the crowd that initially breached the
building and again reaffirmed that he never made entry inside the building.
Interviewing Agents then reminded REGISTER that truthfulness in this
situation would be in his best interest, at which point REGISTER admitted to
physically entering inside the Capitol building. Interviewing Agents then
showed REGISTER a photo of himself inside the Capitol, to which he confirmed
was him.

Figure 12[17]

Mr. Gionet has not been accused of being dishonest at any point and has never denied entering the Capitol.  Register also has a criminal history in which he once had his probation revoked.

Also, again, like many of the others who have received lengthy incarceration for this misdemeanor, Mr. Register factory reset his phones to destroy evidence.  Again, this is not something Mr. Gionet is accused of doing. Further, Mr. Register "[R]an past a line of law enforcement as it was being breached and ignored officers who were trying to clear the building." *United States v. Register*, 1:21-cr-00349-TJK Govt. Sent. Memo, (12/28/21), p.1.  Finally, Mr. Register actively led others inside the building and into the area in which Ashly Babbit was killed.  Mr. Gionet didn't lead anyone anywhere.  Mr. Gionet really was there documenting with his phone as he had many times in the past.

The facts of Mr. Gionet's entry into the Capitol as well as his actions on January 6, 2021, do not come close to matching those who have received lengthy terms of incarceration.  A common theme seemed to be interwoven in those who did receive 75 days or more, many of those defendants took active steps to destroy

---

[17] *States v. Register*, 1:21-cr-00349-TJK Govt. Sent. Memo, (12/28/21), Exhibit A p.2.

evidence that the FBI wanted.  In some instances, the defendants were untruthful

with the FBI about their participation.  Also, many of the defendants were active

or participated in some form in pushing on police lines or breaking police lines.

Finally, another common thread with the defendants of whom received 75 days

incarceration, or more is that they had lengthy (lifetime) records of convictions

for criminal activity.

None of the above applies to Mr. Gionet.  Mr. Gionet arrived late to the

scene.  He did not participate in any of the events that overran officers to breach

the Capitol.  When Mr. Gionet arrives to the Capitol he leisurely strolled around

the East Plaza outside the Capitol where it appeared that there really wasn't much

action at all and only became aware that others had entered the Capitol when

viewers of his livestream informed him, presumably because they were watching

other peoples' feeds, and then reported it to Mr. Gionet.  Mr. Gionet then made a

lengthy trek around the Capitol to the West side.  When he did arrive, there was

no police presence or barricades.  He didn't scale any walls or scaffolding to enter

the Capitol, nor did he push past police or through broken windows or doors.

Mr. Gionet continued leisurely strolling on in through an open door where

no one told him not to enter.  He can be seen on Capitol surveillance strolling on

through the first set of doors and then it appears an officer is holding the second

set of doors open as he passes through the second set of doors.  Even if the officer isn't actively holding the door open, he is standing right by the door as Mr. Gionet strolls inside.   The officer makes not comment or directive for Mr. Gionet to leave.

Once inside, Mr. Gionet does voice opposition to others breaking things in the Capitol and says multiple times to some of those who were damaging property to stop.  Specifically, he tells others, *"Don't destroy anything…We don't need to, don't break anything, just enjoy your time here in your house."*  Again, a bit later he tells others, *"Don't break stuff.   You don't want to be liable."* And after someone else was breaking something Mr. Gionet yells at him, *"Hey don't break shit."*  As a livestreamer, Mr. Gionet's intentions were to document, not break or destroy anything or be physical with officers.  He is opinionated and he was there in support of former President Trump, but his genuine purpose for being there was to document.

A sentence of incarceration would not be in line with what others have been sentenced to who had similar facts to Mr. Gionet. Below are sentencings in your honors Court of whom more closely align or have someone similar facts as in Mr. Gionet's matter.

## IV.   Those With Facts or Circumstances More Aligned with Mr. Gionet's.

### A. Brandon Prezlin – 1:21-cr-000694-TNM

Mr. Prezlin received a sentence of 10 months of probation along with fines, restitution and community service in this Court.  Mr. Prezlin, like Mr. Gionet, entered a door that was open as he entered with no law enforcement present.  Also, when directed by law enforcement to leave, both Mr. Preslin and Mr. Gionet did so.  Additionally, like Mr. Preslin, Mr. Gionet was not a member of or part of any group.  He was not an organizer and formed zero intent to get into any physical confrontations with law enforcement.  Like Mr. Prezlin, Mr. Gionet did not break, damage or steal any property.   They did not hurt, injure, or threaten law enforcement or anyone else. Possibly, one of the only differences may have been that Mr. Prezlin did not enter any private offices while Mr. Gionet did.  However, it was in one of the private offices where Mr. Gionet witnessed another person damaging property and yelled at him to stop.   Additionally, the government accused Mr. Prezlin of being untruthful and initially saying that he did not enter the Capitol.  While Mr. Prezlin's attorneys argued it was a miscommunication, there is no such miscommunication from the interview Mr. Gionet was in with the FBI.  At no point has Mr. Gionet been accused of being untruthful.

### B. Matthew Buckler 1:22-cr-00162-TNM

Mr. Buckler was also sentenced in this Court for the same charge as Mr. Gionet.  He received a 14 sentence of home detention, 24 months' probation, 60 hours of community service and restitution.  There are differences between Mr. Bucklers actions and Mr. Gionet's actions. Mr. Buckler climbed through a broken window when entering the Capitol for a second time.  Mr. Buckler made his way into Senator Merkley's office where others were smoking weed and damaged the senator's property.  Unlike Mr. Gionet, there is no record of Mr. Buckley ever yelled at others inside the office not to destroy or damage property.  Additionally, unlike Mr. Gionet's truthfulness with the FBI, according to the government, Mr. Buckley was untruthful with the FBI when interviewed.

### C. Lisa Homer – 1:22-cr-00238-TNM

Ms. Homer was also sentenced for the same charge as Mr. Gionet has pled guilty to.  She was also sentenced in this Court.  In her instance, she was sentenced to 36 months of probation, a fine, restitution and 60 hours of community service.  Unlike Mr. Gionet, Ms. Homer wore tactical gear including a tactical helmet, goggles, gloves, a ballistic vest and a backpack with other miscellaneous items. The government wrote in their sentencing memorandum, "Prior to entering the Capitol building Homer pulled up the gator that was around her neck so that it

28

covered her mouth and nose.   Home also put on dark color goggles and a protective helmet with a green camouflage pattern, before entering the Capitol. This demonstrates she was expecting violence and voluntarily went inside the U.S. Capitol building."

If the government believes that the manner in which Ms. Homer was dressed was a demonstration of her expectation of violence then logically, the reverse is true for someone who did none of those things.   Mr. Gionet wore no tactical gear.   He wore no helmet and no goggles.   The manner in which Mr. Gionet was dressed, by the government's logic, demonstrates that he was not expecting violence, that he had no intentions of being in any violent confrontations and that he had no plans to engage in violence.   Despite the government's theory in Ms. Homer's case, Ms. Homer, like Mr. Gionet, did not engage in violence, the breaking or destruction of property, or engage in any physical confrontations. Additionally, like Mr. Gionet, Ms. Homer was in the building for a period of time and then left without incident.

### D. Frank Bratjan – 1:22-cr-00285-TNM

Mr. Bratjan pled to the same charge as Mr. Gionet.   Mr. Bratjan was sentenced in this Court to 6 months of probation, a fine and restitution.   Unlike what Mr. Gionet experienced prior to his entry inside the Capitol, Mr. Bratjan

experienced some of the earlier violence and witnessed as others physically fought law enforcement.  He watched police deploy chemical irritants as well as taking measures to hold back the crowd.  He continued passing by all of it and entered the Capitol anyway.

When he entered the Capitol, it was not through an open door like Mr. Gionet, but through a broken window.  Unlike Mr. Gionet, Bratjan joined a group of rioters attempting to press forward through a narrow hallway toward Senator Mitch McConnell's office.  "The crowd crushed forward, attempting to break the line of riot police determined to stop their progress toward McConnell's office. The battle went on for several minutes."[18]   As mentioned throughout this memorandum, Mr. Gionet was not violent, nor did he engage with officers with any force whatsoever.  Additionally, Mr. Gionet did not enter the Capitol through a broken window.  Finally, like others, but unlike Mr. Gionet, Bratjan deleted or destroyed evidence according to the government.

**E. <u>Reva Vincent – 1:22-cr-00051-TNM</u>**

Ms. Vincent was sentenced for the same charge as Mr. Gionet.  She was sentenced in this Court to 24 months' probation, 60 hours of community service,

---

[18] *U.S.v. Bratjan*, 1:22-cr-00285-TNM, Govt's Sent. Memo, (09/07/22), p.5.

a fine and restitution.  Vincent admitted to deleting photos and videos in her FBI interview.    Mr. Gionet did not.  Ms. Vincent, like Mr. Gionet both made statements while in the Capitol, like, "Go", "lets go", and "This is our house."

The above 5 cases more closely align with the involvement Mr. Gionet.  To be sure, there are some facts about Mr. Gionet's actions that can be considered more serious such as Mr. Gionet's entry into two senate offices.  However, there are many other facts that weigh on positive side for Mr. Gionet such as his honesty with the FBI, the fact that his entry into the capitol was not through a window or by scaling any walls or scaffolding, and he never destroyed evidence.  For these reasons we believe Mr. Gionet should be sentenced more closely to the sentence received in Mr. Prezlin's or Ms. Reva's case.

### V.   <u>Additional Sentencing Factors Under 18 U.S.C. § 3553(a)</u>

1. The nature and circumstance of the offense and history as well as characteristics of the defendant;

[Discussed in Sections I-VII]

2. The need for the sentence imposed to reflect the purposes of sentencing, seriousness of the offense, deterrence, prevention of future crimes, and rehabilitation.

[Discussed in Section VI as well as Exhibit 8]

3. The kinds of sentences available

[Discussed in VII]

4. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

[Discussed in III and IV]

## VI.   **Seriousness, Deterrence, Public Protection, and Rehabilitation**

A. **Seriousness of the offense**

Of all the charges that have been levied upon January 6th defendants, 40 U.S.C. § 5140(e)(2)(G) is the lowest in terms of possibility of punishment but also the specific alleged facts that are attributed to those who did not break or damage property or become physical with law enforcement.   In other recent cases involving defendants who interrupted Senate deliberations of Supreme Court nominated Justice Brett Kavanaugh defendants who were arrested, some of whom had entered the Senate chambers.   In all of those instances, the defendants were charged under DC Code and most paid a $50 fine to resolve their case.[19]

---

[19] Brett Kavanaugh: Hundreds arrested in Supreme Court protest, BBC News (10/5/2018), Brett Kavanaugh: Hundreds arrested in Supreme Court protest – BBC News

B. **Deterrence of Criminal Conduct and Protecting the Public**

Mr. Gionet has been subject to being in custody, home detention, GPS monitoring and round the clock supervision by a probation officer for 2 years. In addition to the above, Mr. Gionet has been swatted on over 20 occasions. The experience he has gone through and his actions since his arrest demonstrate that the process itself has effectively deterred any further criminal conduct by Mr. Gionet. He has completely changed the way in which he makes his living to avoid being in positions in which this could ever happen again.

## VII.   Kinds of Sentences Available

Parading, Demonstrating, or Picketing in a Capitol Building is a violation of Title 40, U.S.C. § 5104(e)(2)(G). The code provides a maximum sentence of six months of imprisonment, a term of probation not more than 5 years, a fine of not more than $5000.00 and an obligation to pay any interest, penalties, fines, and/or restitution not timely made.

## VIII. The Twitter Files

On December 2, 2022, Elon Musk, the new owner of Twitter, begin to release files, communications, emails, and internal memos that provide hard evidence that Twitter worked hand in hand with the Biden team and administration to suppress negative coverage. Especially any information relating

to the infamous Hunter Biden laptop.  Many Americans had feelings that collusion existed with the big tech platforms and those in power and much frustration stemmed from these beliefs which was at least a factor in the events that led to the mass gathering in Washington D.C. to protest the inequities.

On Sat, Oct 24, 2020 at 5:39 PM                    @twitter.com> wrote:

More to review from the Biden team:

https://twitter.com/jared87983561/status/1320159679700373504
https://twitter.com/let3481/status/1320154175481626624
https://twitter.com/JSJX_2/status/1320152593742614529
https://twitter.com/ozwenya/status/1320151083692388352
https://twitter.com/GuySquiggs/status/1320149308625145856

Thanks all.

On Sat, Oct 24, 2020 at 8:28 PM                    )twitter.com> wrote:

handled these.

Figure 13[20]

Big tech collusion with the government was also confirmed from the mouth of Facebook owner Mark Zuckerberg when he appeared on Joe Rogan's podcast

---

[20] Twitter Files – Matt Tabbi, (02/02/22), <u>Matt Taibbi on Twitter: "8. By 2020, requests from connected actors to delete tweets were routine. One executive would write to another: "More to review from the Biden team." The reply would come back: "Handled." https://t.co/mnv0YZI4af" / Twitter</u>

that the FBI gave Facebook a warning that Russian disinformation would be coming. The laptop has been confirmed to be real as well as the contents on the laptop that link "The Big Guy" to Hunter Biden's activities and corruption.

> "Yeah, it sucks," Zuckerberg said. "It turned out after the fact, the fact-checkers looked into it, no one was able to say it was false … I think it sucks, though, in the same way that probably having to go through a criminal trial but being proven innocent in the end sucks."

Figure 14[21]

It appears it really is a conflict of interest for the same law enforcement agency that helped suppress information about the laptop to be involved with the arrests of those who felt like the election may not have been as fair as it should have been. In any event, the release of Twitter Files at a minimum provides some grounding to the reasons that people had such high emotions about whether the election was fair or not. As it turns out, some of those concerns have been substantiated. Storming the Capitol was not the right answer to the frustration. However, many who traveled to Washington D.C. normal people were acting on

---

[21] The Joe Rogan Experience, Joe Rogan interview with Mark Zuckerberg, (08/25/22), https://open.spotify.com/episode/51gxrAActH18RGhKNza598?si=pnhjEExQSmm ZaDsUOMQLaQ

the belief that this country was founded on strong beliefs of freedom and the

knowledge that freedom isn't "free" in the sense of the cost of freedom.  They

acted with a sense that duty as an American Citizen demanded that they act.  As

an example, Reva Vincent (as mentioned above) was a 57-year-old grandmother

who believed to her core that the country, as we have always known it, could not

go on if no one acted.  The governments inclusion of her social media post in their

sentencing memorandum illustrates her beliefs.

> How did we get here? Well I know on my part I feel asleep[.] I know that
> we the people wasn't awake[,] we the people didn't watch and learn what
> was happening[.] [C]ongress has decided they know what[']s best for us
> congress decides what we do, where we go, when we work, when we
> worship, when our kids go to school[,] what they learn and it[']s all out
> [sic] fault[.] [W]e fell [sic] to be alert we fail to say NO but there is one
> way to stop this, **WE THE PEOPLE SAY NO MORE and that will be
> on January 6th 2021[.] [I]f you can go please be there we need all we
> can get.** Side note I am not going to DC for ME I am going for my
> GRANDKIDS, GREAT GRANDKIDS, and all others that come after me
> if we don't STAND and yes this is the last one they will live in a much
> worse country[.] WE MUST STAND NOW. (Emphasis and punctuation
> added).

Figure 15[22]

Ms. Vincent acted, as did many others on January 6, 2021, not because she was

crazy or part of some alt right belief system or group, but because America was

---

[22] *U.S. v. Vincent*, 1:22-cr-00051-TNM, Govt. Sent. Memo (09/14/22) p.6.

founded on the right to gather and protest, and the rally was the chance to show up in numbers to voice opposition to what we now know is true in some form.

The Twitter Files demonstrate there was collusion by the now sitting President and/or his team to at least sway the election by keeping harmful information about Biden and his family out of the public or convince the people it wasn't real. The First Amendment gives the right to peaceably assemble and petition the government for redress or grievances. Again, entering the Capitol was not the correct way, especially so for those who became physical with law enforcement. But folks like Ms. Vincent and Mr. Gionet, and the hundreds or thousands of others who showed up to protest that day, did so with the sincere belief that love for their country meant they could no longer sit back and accept what was happening.

## IX.    Time In Custody, Home Detention and GPS

Mr. Gionet was taken into custody in Houston Texas on January 15, 2021. Mr. Gionet served five days in custody prior to being released on January 19, 2021. Upon release Mr. Gionet served 7 days on home confinement with GPS monitoring until his arraignment hearing on January 25, 2021. The geofence was so tight around the home that Mr. Gionet couldn't even retrieve mail from the mailbox. On January 25, 2021, Mr. Gionet's release conditions changed, and

home detention was removed as a term, but GPS monitoring was kept in place. Mr. Gionet's release conditions were modified again on March 31, 2021, after a request by defense to remove GPS. All total, Mr. Gionet was on GPS monitoring for 89 days. Mr. Gionet's release conditions have required that he also report to a probation officer. He has been required to alert probation to every trip he takes and any or all contact with law enforcement. At the time of Mr. Gionet's sentencing he will have been reporting, with perfection, for a total of 780 days or 2 years, 1 month, and 19 days.

Mr. Gionet has abided by all his terms and conditions for the entirety of his release, flawlessly. With all due respect for the seriousness of the charge at the end of the day Mr. Gionet has done all of this for a misdemeanor, not a felony. Further time in custody is unwarranted. Additionally, Mr. Gionet has demonstrated that he not only understands the seriousness of the charge, but he has proven that he is worthy of the opportunity of probation. If Mr. Gionet violates on probation, then this Court can further punish with incarceration. However, if his past compliance over the last two years is any indication of his future fulfillment of his sentencing terms then this Court will never hear from or about Mr. Gionet again. We humbly request that he be given the opportunity of

probation and respectfully submit that Mr. Gionet has earned it due to his flawless

compliance over the last 781 days.

### X.     **Protecting the First Amendment**

To bring this all back into focus.  Mr. Gionet has pled guilty to Picketing

Inside the Capitol.  He is pleading to such a charge because he never crossed the

line from being a protestor to a rioter.  Former U.S. Attorney Michael Sherwin,

who oversaw the initial stages of the January 6 investigation for the government

stated,

> We have to protect the First Amendment, *the great majority of people there were protestors*… when you cross that line, you cross that line when you cross a police line aggressively, you throw something at a cop, you hit a cop, you go into a restricted area knowing you're not supposed to be there.  These are the plus factors that cross the line from a protestor to a rioter.
>
> Michael Sherwin – Interview with 60 minutes.  March 21, 2021.
>  https://www.youtube.com/watch?v=FoAqWnD7NTI

Mr. Gionet is pleading to the charge of Picketing, Parading, or Demonstrating

because he never crossed that line that Mr. Sherwin delineated.  Had he crossed that

line, there is no doubt he would have been charged accordingly.  A careful review

of memorandums drafted by the government in cases where defendants pled to 40

U.S.C. § 5140(e)(2)(G) reveals a common theme.  An unfair attempt to portray

defendant's pleading to the above charge as guilty of ALL the violence and nefarious

acts that took place on January 6, 2021. It is insincere at best because the government knows that the defendant's who have pled to the above charge specifically did not engage in the greater evils of that day. Therefore, it is unfair for the Government to attempt to lump Mr. Gionet in with the more dishonorable conduct of others that took place that day solely for the purpose of sentencing.

## XI.   **CONCLUSION**

For all the foregoing reasons we respectfully ask that this Court give Mr. Gionet credit for time served for the 5 days in custody as well as an additional 7 days on home detention and 89 days on GPS monitoring and give a sentence one year of probation and a fine as the Court deems appropriate. In the alternative, if the Court is inclined to order incarceration, we would ask that any term be home detention.

Respectfully submitted this 5th day of December 2022.

**THORNLEY LAW FIRM, P.C.**

/s/Zachary Thornley
Pro Hac Vice Admission
Arizona State Bar No: 032363
Thornley Law Firm, PC.
18441 N 25th Ave., Ste. 103
Phoenix, AZ. 85023
Courts@ThornleyLawFirm.com
(602) 686-5223 (Office)
(602) 377-6863 (Direct)
(928) 433-5909 (Fax)
ATTORNEY FOR DEFENDANT