```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2
        * * * * * * * * * * * * * * *     )
 3      UNITED STATES OF AMERICA,         )      Criminal Action
                                          )       No. 22-00132
 4                      Plaintiff,        )
                                          )
 5        vs.                             )
                                          )
 6      ANTHIME GIONET,                   )      Washington, D.C.
                                          )      January 10, 2023
 7                      Defendant.        )      10:07 a.m.
                                          )
 8      * * * * * * * * * * * * * * *     )

 9

10                      TRANSCRIPT OF SENTENCING
              BEFORE THE HONORABLE TREVOR N. McFADDEN,
11                    UNITED STATES DISTRICT JUDGE

12

13      APPEARANCES:

14      FOR THE GOVERNMENT:      ANTHONY L. FRANKS, ESQ.
                                 UNITED STATES ATTORNEY'S OFFICE
15                               111 South Tenth Street
                                 Room 20.333
16                               St. Louis, Missouri 63102

17
        FOR THE DEFENDANT:       ZACHARY THORNLEY, ESQ.
18                               THORNLEY LAW FIRM, PC.
                                 18441 North 25th Avenue
19                               Suite 103
                                 Phoenix, Arizona 85395
20
                                 JOSEPH A. SCROFANO, ESQ.
21                               SCROFANO LAW, P.C.
                                 600 F Street, Northwest
22                               Suite 300
                                 Washington, D.C. 20004
23

24      FOR U.S. PROBATION:      HANA FIELDS

25
```

```
 1    REPORTED BY:              LISA EDWARDS, RDR, CRR
                                Official Court Reporter
 2                              United States District Court for the
                                  District of Columbia
 3                              333 Constitution Avenue, Northwest
                                Room 6706
 4                              Washington, D.C. 20001
                                (202) 354-3269
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURTROOM DEPUTY:  Your Honor, this is
 2    Criminal Case 22-132, the United States of America versus
 3    Anthime Gionet.
 4              From Probation, Officer Hana Fields.
 5              Counsel, please come forward to identify
 6    yourselves for the record, starting with the Government.
 7              MR. FRANKS:  Good morning, your Honor.  Anthony
 8    Franks for the United States.
 9              THE COURT:  Good morning, Mr. Franks.
10              MR. THORNLEY:  Good morning, your Honor.  Zachary
11    Thornley on behalf of Anthime Gionet, who is present today
12    as well.
13              THE COURT:  Good morning, Mr. Thornley.
14              MR. SCROFANO:  Good morning, your Honor.  Joseph
15    Scrofano, local counsel for Mr. Gionet.
16              THE COURT:  Good morning, Mr. Scrofano.
17              And good morning, Mr. Gionet.
18              THE DEFENDANT:  Good morning.
19              THE COURT:  We are here for sentencing in this
20    case.  The Defendant has pled guilty to one count of
21    parading, demonstrating or picketing in a Capitol building
22    in violation of 40 USC 5104.
23              I've received and reviewed the presentence
24    investigation and sentencing recommendation from the
25    probation office as well as sentencing memoranda from the
```

1      Government and Mr. Gionet.

2              Mr. Gionet's memorandum had a number of video

3      exhibits and a mitigation memorandum attached to it.

4              Are there any other documents or materials that I

5      should have reviewed?  Mr. Franks?

6              MR. FRANKS:  Yes, your Honor.

7              The Government would request that Defendant's

8      conviction in -- I believe it's October 2022, which is

9      referenced -- which is referenced in the Government's

10     sentencing memorandum should be included in the final PSR.

11     That's a conviction for criminal damage, attempt to commit

12     criminal damage, for misdemeanors out of Maricopa County,

13     Arizona.

14             THE COURT:  I did see that in your memorandum.

15     And I understand from Officer Fields that she does have now

16     a copy of that conviction.  I'll hear from Mr. Thornley.  I

17     certainly -- I was intending to proceed on the assumption

18     that that's correct.  I guess it's not quite clear to me why

19     we would need to revise the PSR, though.

20             MR. FRANKS:  It's not included in the PSR.

21             THE COURT:  I understand that.  But what

22     difference does it make for a misdemeanor?

23             MR. FRANKS:  It just reflects his criminal

24     history.  That's it.

25             THE COURT:  Okay.  So, Mr. Thornley, do you

1    disagree with the suggestion that that in fact occurred, the

2    conviction occurred?

3          MR. THORNLEY:  I'm sorry, your Honor.  Can you

4    repeat that?

5          THE COURT:  Yes.

6          Do you dispute that the Defendant was, in fact,

7    convicted on that misdemeanor case?

8          MR. THORNLEY:  We do not, your Honor.  But that

9    was conduct prior to the situation which we're here for

10   today.

11         THE COURT:  Right.

12         So I'm not going to ask Probation to redo the PSR,

13   but I am proceeding on the understanding that the Defendant

14   has I think two prior convictions that relate to conduct

15   that immediately preceded January 6th.

16         Mr. Gionet, this sentencing hearing will proceed

17   in three steps, some of which may seem a bit mechanical to

18   you.  But I want you to keep in mind why we're here today

19   and the gravity of the situation:  You've committed a

20   federal crime.  Today's proceeding is a serious matter, as

21   it is about the consequences that you will face because of

22   your decision to engage in criminal behavior in violation of

23   federal law.

24         Sir, the first step of today's hearing is for me

25   to determine whether you've reviewed the presentence report

1   and whether there are any outstanding objections to it and,

2   if so, to resolve those objections.

3          The second step is to hear from the Government,

4   from your attorneys and you, sir, if you wish to be heard

5   about sentencing in this case.

6          And the last step requires the Court to fashion a

7   just and fair sentence in light of the factors Congress set

8   forth in 18 USC 3553(a).

9          As part of this last step, the Court will actually

10  impose the sentence along with the other required

11  consequences of the offense.

12          So turning to that first step, the final

13  presentence report was filed on October 31st, 2022.  The

14  probation office filed its sentencing recommendation on the

15  same day.  The Government filed a memorandum in aid of

16  sentencing on November 15th and Mr. Gionet filed a

17  memorandum in aid of sentencing on December 5th.

18          Does the Government have any objection to any of

19  the factual determinations set forth in the report?

20          MR. FRANKS:  No, your Honor.

21          THE COURT:  Mr. Thornley, have you and Mr. Gionet

22  read and discussed the presentence report?

23          MR. THORNLEY:  Yes, your Honor, we have.

24          THE COURT:  And does the Defendant have any

25  objections to any of the factual statements set forth in it?

1          MR. THORNLEY:  No objection, your Honor.

2          THE COURT:  Mr. Gionet, could you approach the

3    podium, sir.

4          Sir, are you fully satisfied with your attorney in

5    this case?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  Do you feel you've had enough time to

8    talk with him about the probation office's presentence

9    report and the papers the Government filed in connection

10   with sentencing?

11         THE DEFENDANT:  Yes, your Honor.

12         THE COURT:  Thank you, sir.  You may have a seat.

13         The Court will accept the facts as stated in the

14   presentence report.  The presentence report will serve as my

15   findings of fact for purposes of this sentencing.

16         The sentencing guidelines do not apply because

17   this crime is a Class B misdemeanor.  The maximum prison

18   term the Court may impose for this offense is six months.

19   The maximum fine the Court may impose is $5,000.

20         Supervised release is inapplicable for this

21   offense.

22         There's also a mandatory special assessment of

23   $10.

24         Under 18 USC 3561(c)(2), Mr. Gionet is eligible

25   for up to five years of probation because the offense is a

1    misdemeanor.  The Defendant has agreed to pay restitution in

2    the amount of $500.

3              Have I stated accurately the statutory framework

4    under which we are operating in regard to this case?

5    Mr. Franks?

6              MR. FRANKS:  Yes, your Honor.

7              THE COURT:  And Mr. Thornley?

8              MR. THORNLEY:  Yes, your Honor.  That's correct.

9              THE COURT:  Mr. Thornley, specifically on the

10   Government's suggestion that I can impose a jail term and

11   probation, do you have a position on that?

12             MR. THORNLEY:  Your Honor, I did not address that

13   in the sentencing memorandum because upon review of many,

14   many sentencing memorandums and also prior sentencings, so

15   within this Court, it appeared that that was something that

16   the Court would do.  And so I guess that's a long way of

17   getting around to saying that I don't object, your Honor.

18             THE COURT:  I appreciate that, sir.

19             And actually, I think it's an issue that's in

20   front of the circuit right now.  I'm not sure that it's

21   crystal clear whether the Government is correct on this.

22   But having reviewed the cases the Government has cited, I

23   think the Government is correct.  And I'm persuaded by Judge

24   Lamberth's opinion in *United States versus Little*, 590 F.

25   Supp. 3d 340, from this district in 2022.  Judge Lamberth

1    found that two statutes bear on this issue, 18 USC 3551 and

2    3561.  3551 sets out the general rule that guilty parties

3    may be sentenced to probation or prison, but not both.

4          This section also explains that courts may depart

5    from its rules where other statutes specifically contradict

6    it.  The preface to this section says "except as otherwise

7    provided."

8          I think 3561(a) provides such a specific rule.

9    Defendants may be sentenced to a term of probation unless,

10   quote, "the Defendant is sentenced at the same time to a

11   term of imprisonment for the same or a different offense

12   that is not a petty offense."

13         As Judge Lamberth found, the petty offense clause

14   extends to the same or a different offense clause in its

15   entirety -- that's from Page 347 from the *Little* opinion --

16   unless none of the conditions barring a sentence of

17   probation are present in this case.

18         I think the context also supports that reading.

19   There's no comma separating the words "same" and

20   "different," and the word "same" is not followed directly by

21   the word "offense," which suggests the phrases are bound

22   together as one unit.  More, "same" is not used as a pronoun

23   in the two preceding provisions, but rather it is used as an

24   adjective.

25         As Judge Lamberth points out, other statutes use

1    similar phrasing consistently with the Court's reading here.

2    This interpretation is also supported by the Fourth

3    Circuit's unpublished opinion in *United States versus*

4    *Posley*, 351 Fed.Appx. 807, Page 809 from 2009.  I understand

5    that at least one of my colleagues has a different

6    interpretation, but I think on the whole the Government and

7    Judge Lamberth have the better of the argument here.

8              So to be clear, I'm not at this point making any

9    finding about whether a split sentence is appropriate in

10   this case, but I do agree with the Government that I have

11   the authority to issue one.

12             Before I discuss the other sentencing factors that

13   will bear on the Court's final decision, I will at this

14   point share with the parties the particular sentence the

15   probation office has recommended, taking into account the

16   advisory guidelines sentence, the available sentences and

17   all of the factors listed in Section 3553(a):  Probation has

18   recommended a sentence of 45 days' incarceration, no

19   probation, a $2,000 fine, restitution in the amount of $500

20   and a special assessment of $10.  The recommendation of the

21   probation office is based solely on the facts and

22   circumstances contained in the presentence report.

23             And I want to thank Officer Fields for her work on

24   this case.

25             I must now consider the relevant factors that

1    Congress set out in 18 USC 3553(a) to ensure that the Court

2    imposes a sentence that is sufficient but not greater than

3    necessary to comply with the purposes of sentencing.  Those

4    purposes include the need for the sentence imposed to

5    reflect the seriousness of the offense, to promote respect

6    for the law and to provide just punishment for the offense.

7    The sentence should also afford adequate deterrence to

8    criminal conduct, protect the public from future crimes of

9    the Defendant and promote rehabilitation.

10           In addition to the guidelines and policy

11    statements, I must consider the nature and circumstances of

12    the offense, the history and characteristics of the

13    Defendant, the need for the sentence imposed, the guideline

14    ranges, the need to avoid unwarranted sentence disparities

15    among defendants with similar records who have been found

16    guilty of similar conduct and the types of sentences

17    available.  And of course, since this is a misdemeanor case,

18    the guidelines ranges themselves don't apply.

19           Does the Government wish to be heard on the

20    application of the factors set forth in 3553(a), request a

21    variance or otherwise make a sentencing recommendation?

22           MR. FRANKS:  Yes, your Honor.

23           THE COURT:  Go ahead, sir.

24           MR. FRANKS:  On January 6th, over 16,000 people

25    watched the Defendant livestream his conduct at the Capitol.

1    In addition, he filmed other people who were in the Capitol

2    rioting.  And to say that 16,000 people was a lot is an

3    understatement.  This is more than the 14,623 seating

4    capacity at the JPJ, Virginia's basketball arena, which is,

5    I believe, your Honor's alma mater.

6              THE COURT:  It was being built when I was there.

7              MR. FRANKS:  Okay.  So that's a lot of people.

8              The Defendant is a marketer.  And using marketing

9    terms, he reached a lot of people and he created a lot of

10   impressions.  For his conduct at the Capitol, the Government

11   is recommending a sentence of 75 days' incarceration

12   followed by three years of probation, 60 hours of community

13   service and $500 restitution.

14             In terms of the nature and circumstances of this

15   offense, Defendant urged others to join him as he recruited

16   them as he walked along the streets approaching the Capitol.

17             He witnessed property destruction and he

18   livestreamed it to his 16,000 followers.  He cursed and he

19   berated a police officer who was doing his job, who was

20   trying to get the Defendant to leave the Capitol.  And he

21   livestreamed that conduct.

22             He entered sensitive areas of the Capitol, two

23   Senate offices.  He livestreamed that.  He filmed himself

24   using a senator's phone and acting as though he was calling

25   the Senate.

1          He went to another office in the Senate and, using

2     his language, he said:  We ain't leaving this B.

3          And that was insightful because after the officer

4     was doing his job and forced him out of the Capitol, he

5     reentered it and breached it a second time, which is another

6     aggravating factor in this case.

7          He broadcast all of his activity to his followers,

8     16,000 people who were watching him.  And he attempted to

9     profit monetarily from his conduct, from the violence and

10    the anarchy that he filmed, and he sought to make $2,000 off

11    of his filming.

12         The Defendant has certainly earned the sentence

13    that we're recommending.

14         THE COURT:  Mr. Franks, can you help me

15    understand, when you say he sought to earn, that was -- I

16    guess people kind of pay chips or something --

17         MR. FRANKS:  Yes.

18         THE COURT:  -- as he is livestreaming?

19         MR. FRANKS:  Yes.  In the video exhibits that the

20    Government submitted, there are things that are called

21    lemons.  And in our debrief with the Defendant, he explained

22    that lemons are monetarily valued.  And he explained that

23    the platform that he was livestreaming on, DLive, was

24    supposed to pay him $2,000 for what he did.  And he was in

25    litigation to obtain the $2,000 for his filming on January 5

1    and January 6.

2              THE COURT:  Okay.  Thank you.

3              MR. FRANKS:  Now, in terms of the history and

4    characteristics of Mr. Gionet, it includes some criminal

5    history.  Less than one month before he arrived at the

6    Capitol, Mr. Gionet was involved in two incidents, which I'm

7    sure that the Court is familiar with.  But I'll highlight

8    those.

9              He violently assaulted a security guard who the

10   Defendant pepper sprayed because that security guard was

11   trying to stop the Defendant from filming on private

12   property and getting him to leave.  Actually, it was two

13   security guards.

14             The Defendant was sentenced to 30 days'

15   imprisonment for those offenses, which included assault,

16   disorderly conduct, fighting, and trespass.  Those were out

17   of Maricopa -- that conduct was in Maricopa County, Arizona.

18             Also in the same month, while broadcasting again

19   live, Gionet tried to topple a menorah and tear down a

20   Hanukkah sign that was displayed at the Arizona State

21   Capitol.

22             That's the backdrop of the Defendant presenting to

23   the Capitol on January 6th.

24             Now, in reviewing the Defendant's mitigation

25   report and his sentencing memo, the Defendant casts blame at

1   others for his conduct.  In terms of those two incidents in

2   Maricopa County, he blames his viewers, the people that he's

3   making money off of, for his conduct.

4       He said that his online audience urged him to

5   pepper spray the security guard.  That's actually in direct

6   contradiction to what he told the officers and what's noted

7   in the presentence investigation report, where he says that

8   he was acting in self-defense.

9       He also said that his online audience told him to

10  tear down the display at the Capitol, the Arizona State

11  Capitol.

12      And he continues blaming others for this incident.

13  He blames the police for making him leave the Capitol by

14  allegedly pushing him.  He blames the police who were at the

15  Capitol and who he passed when he initially breached the

16  Capitol.

17      And finally, he blames two other people.  He

18  blames someone -- he devotes five of the first pages of his

19  sentencing memo to someone named Ray Epps, who is on film

20  saying that he is going to the Capitol the next day.  He

21  also blames his online followers for motivating him to

22  breach the Capitol.

23      Now, in context, the Defendant on January 6th was

24  33 years old.  He is a college grad.  He admitted in his

25  change of plea that he knew that he illegally entered the

1   Capitol.

2           He alone is responsible for his actions and he

3   should be punished accordingly.  And I know this Court will

4   do so.

5           On that point, in terms of what someone should

6   expect from the Court, while the Defendant was waiting

7   sentencing, he also livestreamed what his thoughts were.  On

8   October 19, 2022, he characterized this Court in a certain

9   way which I won't repeat; and he also characterized the

10  Honorable Judge Sullivan, who was the prior judge in this

11  court.  And I found -- the Government found those

12  characterizations to be quite troubling.

13          One thing the Defendant said, though, that I think

14  is true is that he said that before this case was

15  transferred that he expected to go to prison for six months.

16          The Government offers that the Defendant was

17  justified in believing that he should go to prison for his

18  behavior.  A sentence of 75 days is not just just

19  punishment; it should deter the Defendant.

20          Without him going to prison, he won't stop what

21  he's doing.  In fact, as the presentence investigation

22  report shows, while he was on pretrial release in this case

23  on May 26th, he was seen agitating others.  He livestreamed

24  it.  And he was making threats to others and not complying

25  with the conditions of his release, also in that incident

1      not cooperating with the police.

2              His two arrests prior to entering the Capitol in

3      December of 2020 didn't deter his conduct here on

4      January 6th.

5              And in terms of general deterrence, again,

6      Defendant reached over 16,000 people in his livestream.

7      Those people will monitor what happens here in this court

8      and the sentence that the Court gives, and they should

9      expect that the Defendant's actions warrant prison time.

10             And why?  As the Government pointed out in its

11     sentencing memorandum, anyone who enters the Capitol

12     illegally twice should expect some serious consequences.

13     Anyone who encourages others to enter the Capitol, like the

14     Defendant did, should expect some serious consequences.

15     Anyone who enters sensitive areas of the Capitol -- and this

16     Court has pointed out how dangerous in another case that is.

17     And anyone who has the audacity to film themselves engaged

18     in illegal conduct in the Capitol on January 6th should

19     expect some serious consequences.

20             In fact, one of the Defendants's 16,000 followers,

21     as the Government pointed out on Page 16 of its sentencing

22     memorandum said, quote:  "This is a federal crime, FYI.

23     Enjoy prison."

24             And the Defendant should be sent to prison for his

25     conduct.

1          Also, in terms of deterrence, there's some people

2     who legally petition when they're upset with the Government.

3     They send letters and call their senators.  They picket

4     outside.  And they conduct themselves in a legal manner.

5     Those people may look at what happens here with the

6     Defendant and be swayed either way in terms of their

7     conduct.

8          Now, I'm sure that the Court has received the

9     Government's video evidence.  I'd like to highlight a couple

10    of those for sentencing, with the Court's indulgence.

11          THE COURT:  Okay.

12          MR. FRANKS:  I'll start with Exhibit 3-A at the

13    beginning.  Now, the Defendant complained about someone else

14    on January 5th, who he said that they were going into the

15    Capitol.

16          But on the next day, January 6th, the Defendant

17    actually was recruiting people who were on the east front of

18    the Capitol and he was asking them to go with him to the

19    Capitol as the police were trying to thwart others from

20    entering the Capitol.

21          (Whereupon, segments of Government's Exhibit

22    No. 3-A were published in open court.)

23          MR. FRANKS:  And I'll stop it right there.

24          The Defendant is well aware of what's going on on

25    the other side of the Capitol.  Again, he focuses five pages

1    of his sentencing memorandum to what other people and

2    another person said the day before about going inside the

3    Capitol.  But the next day, the Defendant actively recruited

4    others, knowing that the police were trying to stop people

5    from going into the Capitol.

6              I'll continue the video.

7              (Whereupon, segments of Government's Exhibit

8    No. 3-A were published in open court.)

9              MR. FRANKS:  The Government would like to show a

10   Defendant's exhibit, actually, Defendant's Exhibit No. 6.

11   Defendant claims that -- in his sentencing memo that the

12   police held open the door on the upper west terrace and held

13   the door open for him.  But the Defendant's exhibit actually

14   doesn't show that.  It shows the Defendant actively walking

15   through a door held open by another rioter.

16             I will advance to 6:39 of this video.  This is

17   Defendant's Exhibit 6.

18             (Whereupon, segments of Defendant's Exhibit No. 6

19   were published in open court.)

20             MR. FRANKS:  I'll stop it here.

21             At this point, there is a Capitol Police officer

22   at the door.  As the Court will note, there are individuals

23   who are behind that officer.  There are rioters in the

24   Capitol who that officer is ushering out.

25             As you'll see later in this video, at the same

1    time, there are rioters who are coming into the Capitol; and

2    as the Court will see, this officer is vastly outnumbered by

3    those entering and exiting the Capitol.

4            THE COURT:  So at this point, people are exiting

5    the Capitol?

6            MR. FRANKS:  Yes.  At this point right here.

7            (Whereupon, segments of Defendant's Exhibit No. 6

8    were published in open court.)

9            MR. FRANKS:  So the officers close the door at

10   this point, which is 17:16 of the video.

11           Another officer presents, and that officer and the

12   other Capitol Police officer confront this one person who's

13   trying to enter the Capitol.

14           (Whereupon, segment of Defendant's Exhibit No. 6

15   were published in open court.)

16           MR. FRANKS:  At this point, there are still

17   rioters inside the Capitol behind the police and there are

18   rioters who are approaching from outside.

19           The crowd from outside begins to increase and, as

20   is clear, the police are vastly outnumbered at this point.

21   At this point, the rioters push past the police.  And that

22   is at 8:15.

23           (Whereupon, segments of Defendant's Exhibit No. 6

24   were published in open court.)

25           MR. FRANKS:  At 8:26 on the counter of this video,

1   the Defendant appears.  There are no police holding the door

2   open at this point.

3          The Defendant is about to use his left hand at

4   8:28 of this video to open the door for himself, contrary to

5   what he says in his sentencing memorandum.  The police are

6   not holding the door open for him.  There's Defendant's left

7   hand on the door, and he walks into the Capitol by himself.

8          Now the Government would like to show Government's

9   Exhibit 10.

10          (Whereupon, segments of Government's Exhibit No.

11   10 were published in open court.)

12          MR. FRANKS:  At this point, the Defendant has

13   advanced from the upper west terrace to the Senate wing,

14   where he and other rioters fully occupied that area, and the

15   Defendant tells other rioters not to leave and that he's not

16   leaving.  And at this point, he's livestreaming.

17          Stopping at four seconds, the Defendant films a

18   broken window in the Senate wing.  Some people are leaving,

19   but Defendant decides he's going to stay.

20          (Whereupon, segments of Government's Exhibit No.

21   10 were published in open court.)

22          MR. FRANKS:  That's the Defendant.  He's calling

23   the police traitors at this point at 37 seconds into the

24   video.  That was Defendant saying, "Don't worry.  I'm not

25   leaving" at 50 seconds in the video.

1          (Whereupon, segments of Government's Exhibit No.

2     10 were published in open court.)

3          MR. FRANKS:  At 56 seconds into the video, that is

4     the Defendant telling the other rioters, "Do not leave,"

5     quote.

6          Instead of leaving, as is shown in Government's

7     Exhibit 12, the Defendant advances further into the Capitol

8     into Senator Merkley's office.

9          (Whereupon, segments of Government's Exhibit No.

10    12 were published in open court.)

11         MR. FRANKS:  At this point, the Defendant is

12    promoting himself and his platform, Baked Alaska, on DLive.

13    And then he commenced to use the senator's phone.

14         (Whereupon, segments of Government's Exhibit No.

15    12 were published in open court.)

16         MR. FRANKS:  At this point, the Defendant is

17    essentially making a mockery out of democracy.

18         He doesn't stop there.  He goes to another Senate

19    office, as shown in Government's Exhibit 13.

20         (Whereupon, segments of Government's Exhibit No.

21    13 were published in open court.)

22         MR. FRANKS:  This is the Defendant approaching

23    that office.  I'll advance to two minutes.  He's filming

24    another rioter in a windowsill.  And again, this is being

25    sent to -- if the Court can see this at the top where it

1    says Baked Alaska, it says 16,000 -- 16.63 K.  So over

2    16,000 people are watching this at this time.

3              (Whereupon, segments of Government's Exhibit No.

4    13 were published in open court.)

5              MR. FRANKS:  As this Court previously emphasized

6    in *United States versus Ericson*, the danger posed by rioters

7    who enter Senate offices -- the Court said:  That's a

8    private area, and your violation of that space suggests a

9    certain brazenness and intentionality that requires

10   consideration in your sentence.  You could have caused a

11   very dangerous and fearful scene had the speaker or her

12   staff been present in the office when you and others entered

13   it.

14             That is also true here, where Defendant was in two

15   Senate offices.

16             I'll advance to Government's Exhibit 14.  At this

17   point, there are more police officers in -- or Capitol

18   Police officers in the Senate wing.  They're clearing or

19   attempting to clear out that area of the Capitol.  And

20   instead of complying with them, Defendant has to get forced

21   out.  And you'll hear what he says to that officer.

22             (Whereupon, segments of Government's Exhibit No.

23   14 were published in open court.)

24             MR. FRANKS:  At this point, the officers, the

25   police, are trying to get the Defendant to leave and he's

1    continuing to chant.  He's continuing to film and he's

2    continuing to livestream.

3              (Whereupon, segments of Government's Exhibit No.

4    14 were published in open court.)

5              MR. FRANKS:  So it was clear at this point the

6    Capitol Police have ordered the Defendant to leave the

7    Capitol.  But unlike many rioters who breached the Capitol,

8    Defendant reentered, as shown in the final exhibit for the

9    Government, Exhibit 17.

10             (Whereupon, segments of Government's Exhibit No.

11   17 were published in open court.)

12             MR. FRANKS:  He just said:  "And we're back,

13   baby."

14             (Whereupon, segments of Government's Exhibit No.

15   17 were published in open court.)

16             MR. FRANKS:  So in sum, your Honor, the Government

17   is requesting a sentence of 75 days' incarceration because

18   of the Defendant's actions at the Capitol.  We don't believe

19   that that will create any sentencing disparities.

20             We've outlined a number of cases that support --

21   that we believe support our recommendation.  The one that

22   I'd like to focus on the most is the one that -- the case

23   that was before Judge Sullivan, the *Getzinger* case, that

24   involved a husband and a wife who breached the Capitol and

25   before they did so, they, like the Defendant, were

1    livestreaming their conduct.  They actually had someone

2    following them who was livestreaming their conduct.

3            The Court in the *Getzinger* case sentenced those

4    Defendants to 60 days' incarceration followed by a term of

5    probation.

6            Now, that case is analogous to this case in that

7    they livestreamed their conduct, but the Defendant's actions

8    here are worse.  The Defendants in the *Getzinger* case

9    stopped their livestreaming once they entered the Capitol.

10   They didn't enter two areas of the Capitol, which were

11   sensitive; they entered one, and only for about 40 seconds.

12           They left the Capitol after they breached it one

13   time.  The Defendant here breached the Capitol twice, and he

14   did so after the police told him to leave.

15           And the Getzingers did not recruit others to enter

16   the Capitol, like the Defendant did.

17           We think that -- the Government would offer that

18   Defendant's behavior in this case warrants a sentence that

19   is over the 60 days that the Getzingers received.

20           In terms of distinguishing the cases that the

21   Defendant has cited where others were sentenced to 75 days,

22   one thing that the Defendant -- one argument that he makes

23   is that he didn't destroy any evidence.  But as I've shown

24   you, the Defendant livestreamed his conduct.  His conduct

25   was captured in the public sphere and also on his platform,

1    DLive.  He didn't need to destroy or delete anything; it was

2    in the public sphere, and the Government obtained that.  So

3    he shouldn't get credit for not destroying, because he

4    couldn't destroy.

5             So for all those reasons, your Honor, the

6    Government is recommending a sentence of 75 days'

7    incarceration followed by three years of supervised release,

8    60 hours of community service and a restitution amount of

9    $500.

10            THE COURT:  Thank you, Mr. Franks.

11            Mr. Thornley, do you wish to be heard on the

12   application of the factors set forth in 3553(a), request a

13   variance or others make a sentencing recommendation?

14            MR. THORNLEY:  Yes, your Honor.  Good morning.

15   Thank you, your Honor.

16            THE COURT:  Good morning, sir.

17            MR. THORNLEY:  Your Honor, Mr. Gionet participated

18   in picketing, parading.  That's what he pled guilty to.

19            I don't need to remind the Court, but it's worth

20   mentioning and noting that this is a nonviolent offense.

21   It's nondangerous.  This is not a repetitive offense.  It is

22   a misdemeanor.

23            And although it's a federal crime and it's serious

24   and we know that it's serious, he knows that it's serious,

25   at the end of the day it is still a misdemeanor.  And I

1    don't in any way make light of the fact that it's nothing or

2    that it means nothing.  But it is a misdemeanor.

3           The Government mentioned that Mr. Gionet blamed

4    his conduct on others.  We don't believe that to be a

5    correct characterization, your Honor.

6           With regards to the mentioning of Mr. Epps in the

7    sentencing memorandum, the purpose for that was that the

8    Government had made a point to try to characterize

9    Mr. Gionet saying, "Let's go" during one of their

10   interactions as him agreeing with Mr. Epps.

11          In the video submissions that defense submitted,

12   and I think even the videos that the Government played

13   today, you hear Mr. Gionet say many, many times in different

14   situations:  "Let's go."  It's just a thing that he says as

15   part of his videos when he's doing his videos.

16          So the purpose was to give the correct context of

17   what that conversation contained and what his interactions

18   with Mr. Epps really meant, and it wasn't an agreement that

19   he should go into the Capitol.  In fact, I believe it's

20   pretty clear that he disagreed with that, because in the --

21   I believe Defense Video Exhibit 2, Mr. Gionet is the one who

22   kind of leads the chant, calling Mr. Epps a fed.  And the

23   purpose for that was that he believed that that was

24   incorrect, to go into the Capitol would be incorrect, and

25   that only someone who was maybe trying to incite something

1   bigger or something that maybe they shouldn't do would say

2   something like that.

3          I just want to touch briefly on the fact that

4   Mr. Gionet made a statement about being assigned to this

5   Court after being in the Honorable Judge Sullivan's court.

6          I think that the expression from Mr. Gionet was

7   that he was -- was -- he felt that he was going to be

8   sentenced fairly.  And that's it, your Honor.  There was no

9   mal intent or mal ideas or thoughts on behalf of -- on

10  Mr. Gionet's side when he got assigned to this Court.

11  That's it.  It's still America.  He has the right to be

12  excited or not excited about where he's going to be

13  sentenced or what's going to happen.  It's not against the

14  law for him to feel a certain way about which court he's

15  assigned to.

16         It doesn't mean that there is any nefarious

17  thoughts on his end that he was assigned to this Court for

18  sentencing.

19         I'm not sure that I agree with the Government that

20  Mr. Gionet entered the Capitol twice.  As we see, the

21  Government did not play a video of Mr. Gionet entering the

22  Capitol twice.  They played a video of him entering once.

23  And I think that it's -- although I can't say with 100

24  percent certainty before this Court, your Honor, it looked

25  to me pretty clearly that that second video was when there

1    was a large population of people within the Capitol.  And so

2    it appears to me that it's from an earlier time during his

3    feed.

4          And if you watch -- if the Court had the entirety

5    of his feed, it would show that -- and I think the Court

6    does, actually, in Defense Exhibit 4, Video 4 -- but the

7    entirety of that video shows that -- there's a part where

8    the video feed completely cuts out.  And when he says,

9    "We're back, baby," he's referring to the fact that his

10   video feed came back online.

11         I'd like to --

12         THE COURT:  But isn't that after the interaction

13   with the officers where an officer, he says, pushes him out?

14         MR. THORNLEY:  I can't say 100 percent, your

15   Honor.  I can't say 100 percent.  But I don't believe so,

16   because when you watch that video, when you see that last

17   video the Government played, he's already standing inside

18   the Capitol.  There's -- it's not a video of him entering.

19   He's already inside the Capitol.  And there is a large

20   population of people inside the Capitol at that time.

21         When you can see the video where he's exiting,

22   there's not many people that are left inside the Capitol at

23   that time.  In fact, I think it's just the officer.  He may

24   be one of the last two or three people that was exiting at

25   that point.

 1          THE COURT:  I think the Government has timestamps.

 2   I'm just looking at their memorandum in aid of sentencing.

 3   So at 3:17, we see that interaction with the police officer.

 4   At 3:25, he's back in.  So putting aside his own live feed,

 5   I think the Government has shown from their surveillance

 6   where he is when.

 7          MR. THORNLEY:  Thank you, your Honor.

 8          I'd like to play Defense Exhibit Video 4 or at

 9   least a small portion of that.

10          (Whereupon, segments of Defendant's Exhibit No. 4

11   were published in open court.)

12          MR. THORNLEY:  The Government played a select

13   portion of this video, your Honor.  I want to play -- this

14   is the moment that Mr. Gionet arrived at the Capitol on the

15   side of -- I believe the east side.  Is that correct?  I

16   think it's the east side, your Honor.  That's correct.  The

17   east side of the Capitol, where essentially I don't think --

18   I can't speak for him, but I don't think that many people on

19   that side knew what was happening on the other side.  And

20   this video, at least the beginning of this video,

21   demonstrates Mr. Gionet's knowledge, what was taking place,

22   or lack of knowledge.

23          (Whereupon, segments of Defendant's Exhibit No. 4

24   were published in open court.)

25          MR. THORNLEY:  So, your Honor, the reason for

1   playing that video again is that when Mr. Gionet first

2   arrived, he had no idea what was happening.  He didn't come

3   to the Capitol to storm into the Capitol.  He came there --

4   and I want to make note for the Court that Mr. Gionet

5   records things often.  That's what he has done for a career.

6   And he's worked for several notable institutions or

7   entities, including BuzzFeed.  And that's what he does.  He

8   records things.  I guess maybe another way to phrase it is

9   that he's sort of like a guerrilla journalist or something

10  where he goes into places where there's controversial things

11  happening and records them.

12          On this particular day, he woke up fairly late in

13  the day.  And by the time he arrived at the Capitol --

14  again, he's on the east side -- there was -- it looks like a

15  pretty sparse amount of people there, and he had no idea

16  that anything was happening on the west side of the Capitol

17  or that anything -- that people had broken through the

18  barrier lines and had entered the Capitol at that point.

19          Further into this feed, your Honor, the feed cuts

20  out and then it comes back on.  And I'd like to go to

21  Defendant's Exhibit 6, if it'll come up.

22          Your Honor, Mr. Gionet's requesting a restroom

23  break and I'm having a little bit of difficulty with getting

24  this video coming up.  Would it be okay to take a brief

25  recess?

```
 1                    THE COURT:  Sure.  That's fine.

 2                    MR. THORNLEY:  Thank you, your Honor.

 3                    THE COURT:  You can go ahead.

 4                    (Thereupon a recess was taken, after which the

 5          following proceedings were had:)

 6                    THE COURT:  Mr. Thornley, I've got some matters

 7          that are supposed to be going at 11:30.  So I have reviewed

 8          all the exhibits you sent me, but I'm happy to see any you

 9          wanted to highlight in particular.

10                    MR. THORNLEY:  Thank you, your Honor.  I just have

11          a very brief clip of this particular video.

12                    (Whereupon, segments of Defendant's Exhibit No. 6

13          were published in open court.)

14                    MR. THORNLEY:  Your Honor, right here we can see

15          that -- okay.  The Government may be correct.  The officer

16          may not be holding the door.  But if you can see where the

17          cursor is on the video, the officer is clearly standing in

18          front of the door and remains there while Mr. Gionet walks

19          through.  So the point was more so that Mr. Gionet was not

20          given any commands or directions to leave the Capitol at the

21          time that he entered.

22                    Additionally, there's no allegations whatsoever

23          that Mr. Gionet pushed past any officers, that he pushed

24          past any barricades.  Again, he was there to document.

25          That's what he does.  That particular day was no different.
```

1    He knew there would be some chaos of some sorts, some

2    controversial issues that were being played out in public,

3    and he was there to document.

4          That's why additionally, as noted in the defense's

5    sentencing memorandum, he's not there in tactical gear.

6    He's not there in riot gear.  He doesn't have a helmet on.

7    Honestly, many of the journalists who do go into situations

8    like that, they wear that kind of gear.  But he was not.

9    And he doesn't on any typical location that you'll see where

10   he's doing the same type of recording.

11         And the purpose for bringing that up, obviously,

12   is Mr. Gionet was not planning on encountering any violence.

13   He wasn't there to commit any violence.  He wasn't wearing

14   the type of gear that one would expect if they were going to

15   go into the Capitol to commit violence or push past

16   individuals.

17         With regards to the history, the criminal history

18   that the Government has brought up, the events that

19   Mr. Gionet was found guilty on out of Arizona took place

20   prior to the events of January 6th, your Honor.

21         And it's our belief that from that period of time

22   on, from January 6th on or from the moment that he was

23   arrested, I should say, he has complied with every

24   directive, every request that the Court has made and that

25   Probation has made of him.

1          The deterrence factor has already been made.  It

2    is very clear to Mr. Gionet that his behavior needed to be

3    reformed.  And he has done so.  And we believe that it's

4    very well demonstrated by the fact that his time, which is

5    documented in the sentencing memorandum as well, the five

6    days in jail when he was first arrested, he was on home

7    confinement for seven days, 89 days on GPS and pretrial

8    probation for over two years at this point.

9          Again, your Honor, I circle back to this:  This is

10   a misdemeanor.  And he has done all of that without issue.

11   He has not violated any of his terms.

12         And some of those terms have been quite onerous,

13   your Honor, in regards to checking in anytime he's going to

14   leave the state or -- in which he resides or anytime that he

15   had any kind of interaction with any law enforcement.  He

16   has abided by all his terms, the home employment.

17         The sentencing disparities we believe have been

18   laid out quite well in the sentence memorandum.  I won't go

19   over that with the Court.  Many of the decisions that we

20   believe are comparable are from this Court.  And so I'm not

21   going to remind the Court of the Court's own decisions in

22   these prior cases, but we've laid those out.  And we believe

23   that those cases that we've laid out that were sentenced in

24   this Court more closely align to Mr. Gionet's actions on

25   that day, the actions of being in the Capitol, what he pled

1   guilty to, picketing and parading.

2          It appears from counsel's reading of many of the

3   memorandums that there was a common theme amongst those who

4   did receive larger sentences or sentences of incarceration.

5   Three things kind of stood out.  One of them is that

6   individuals had deleted evidence, basically, videos, photos,

7   erased their phones completely.  That was a big one amongst

8   many, many defendants.

9          Additionally, every individual who accepted a plea

10  had to go through the mandatory FBI debriefing.  Many of

11  those instances where people were given longer sentences or

12  sentences of incarceration, one of the other themes is that

13  individuals lied or misled the FBI during those interviews.

14         And then finally, the other common theme that

15  seems to arise was that many of those individuals had long

16  criminal histories.  Not just one or two misdemeanors, but,

17  like, 20 or more misdemeanors or issues with run-ins with

18  law enforcement.  So a clear pattern that those individuals

19  had exhibited throughout the course of their lives.

20         And clearly, those are not issues that are before

21  this Court today in regards to Mr. Gionet.

22         Your Honor, I wanted to take a brief moment to

23  address essentially the Government's approach to these cases

24  in which a person is sentenced to a misdemeanor.  Again,

25  from review of many of the sentencing memorandums, a theme

1    appears in which the Government attempts to lump the

2    misdemeanor defendants with those who were the really bad

3    actors that day, those who did engage in violence, those who

4    did break property.

5           And it's disingenuous, your Honor.  The Government

6    knows that Mr. Gionet did not engage in those type of

7    activities.

8           Additionally, I have one more video, your Honor,

9    if I may.

10          THE COURT:  Okay.

11          MR. THORNLEY:  This is Video Exhibit 7.

12          (Whereupon, segments of Defendant's Exhibit No. 7

13   were published in open court.)

14          MR. THORNLEY:  I'm going to skip forward to minute

15   11 on this now.

16          (Whereupon, segments of Defendant's Exhibit No. 7

17   were published in open court.)

18          MR. THORNLEY:  Your Honor, I wanted to note

19   Mr. Gionet is not there to push on the cops or shove on the

20   cops.  He fist-bumped that officer.  He said:  We love our

21   cops.

22          I'm going to fast-forward to 19:22.

23          (Whereupon, segments of Defendant's Exhibit No. 7

24   were published in open court.)

25          MR. THORNLEY:  Your Honor, there he's telling

1        other people, "Hey, don't break anything."

2                    Skipping forward to 23.

3                    (Whereupon, segments of Defendant's Exhibit No. 7

4        were published in open court.)

5                    MR. THORNLEY:  So multiple times, sir, over the

6        course of Mr. Gionet -- while he was in there, at least

7        specifically in that specific room where it appeared that

8        others were vandalizing things, Mr. Gionet was very much

9        against that.  And as the Court could hear, he told people,

10       "Hey, don't break things."

11                   Just to kind of circle back around, your Honor,

12       with regards to something the Government mentioned that

13       Mr. Gionet was actively recruiting people, one of the things

14       that I meant to mention when I played the video where he

15       first arrived at the Capitol is that the purpose for playing

16       that also was that -- to show the Court that he had no idea

17       what was happening on the other side.  He was just telling

18       people, "Hey, come with me."

19                   It wasn't recruiting people like an army to go

20       overtake officers on the other side, because other than what

21       his viewers were telling him, "Hey, get to the other side of

22       the Capitol," he had no idea even what was going on.  In

23       fact, he appears confused.  "What?  They're doing what?"

24       Because he's like, "I'm here.  I'm at the Capitol."  He

25       didn't understand what was going on other than what they

1     were telling him.

2              So it wasn't an active -- I believe it's taken out

3     of context, your Honor, to say that he's actively, like,

4     recruiting people to go and help him storm the Capitol.

5              Can I just have one brief moment, your Honor?

6              THE COURT:  You may.

7              MR. THORNLEY:  (Confers with co-counsel

8     privately.)

9              Thank you, your Honor.

10             Your Honor, again, just to reiterate:  This is --

11    Mr. Gionet was not violent.  He served again five days in

12    custody, seven days on home confinement, 89 days on GPS and

13    over two years on probation.

14             We're asking that the Court order one year of

15    probation or, in the alternative, 14 days of home

16    confinement and no probation with credit for the time he's

17    already served, your Honor.

18             THE COURT:  Thank you, sir.

19             MR. THORNLEY:  Thank you.

20             THE COURT:  Mr. Gionet, you have the right to make

21    a statement or present any information to mitigate this

22    sentence.  Would you like to say anything that you would

23    like me to consider before imposing sentence?

24             THE DEFENDANT:  No, your Honor.

25             THE COURT:  Sir, I'll ask you to approach the

1          podium.

2                    MR. FRANKS:  Your Honor, just one -- I just want

3          to move for admission of the exhibits that we played.

4                    THE COURT:  They're all -- we're good, guys.  I've

5          got them all on your memorandum in aid of sentencing.

6                    Sir, I've assessed the particular facts of this

7          case in light of the relevant 3553(a) factors, and I now

8          want to provide remarks for the record and for you,

9          Mr. Gionet, about my considerations in regard to the nature

10         of the offense and your history and characteristics.

11                   As I've said before, I think you participated in a

12         shameful event, a national embarrassment that made us all

13         feel less safe, less confident that our country could be

14         governed democratically rather than by mob rule.

15                   As compared with other January 6th misdemeanants

16         who I've sentenced so far, your conduct stands out in a few

17         ways:  First, I do take seriously that you entered two

18         senators' personal offices.  Those are private areas, and

19         your violation of that space suggests a certain brazenness

20         and intentionality that requires consideration in your

21         sentence.

22                   Whatever First Amendment protest justifications

23         you may have had for being at the Capitol on January 6th,

24         there can be no excuse or justification for trespassing in

25         those offices.

1           Second, I agree with the Government that your

2    reentry into the Capitol and your lengthy time in the

3    Capitol Building are aggravating factors.  You encountered

4    numerous people who had been pepper sprayed; you saw damage

5    to the government property in the building; and you were

6    directed by others to leave.  And yet you continued to

7    livestream from the Capitol.

8           And I agree with the Government's reading of the

9    evidence that you did reenter the Capitol after being told

10   by officers to leave and officers that you cursed at and

11   called traitors.  That's pretty shocking behavior, sir, and

12   it's not at all something that they should have to put up

13   with.

14          I agree with the Government you were encouraging

15   others to enter.  I'm not suggesting this was some sort of

16   longtime plan or anything.  But as the Government points

17   out, you said, "Calling all patriots.  We need backup."

18   You're not only talking to your 16,000-plus people online,

19   but you're in front of people out there on the Capitol

20   encouraging people to go around the back.  I think those are

21   all aggravating factors.

22          Finally, I agree with the Government that your

23   online activities are aggravating here.  You livestreamed

24   your criminal conduct to thousands of people, hoping that

25   they would pay you for your actions.  That puts you in a

1    very different category from the vast majority of

2    trespassers at the Capitol that day.

3           To my mind, it also highlights the importance of a

4    sentence that promotes general deterrence in your case.  You

5    did everything you could to publicize your misconduct, and I

6    think it's important that your followers and the public in

7    general know that such blatant criminality will not be

8    tolerated.

9           And I disagree with Mr. Thornley's suggestion that

10   you were just documenting.  I think you certainly were

11   documenting, but also the types of things you were saying,

12   the chants you were leading, that was all more than just a

13   passive photojournalist.  You were there encouraging and

14   participating fully in what was going on; and by your

15   videoing of it, you were promoting it and celebrating what

16   was a national tragedy.

17          I know you didn't assault anyone, that you didn't

18   damage any property.  In fact, you repeatedly told other

19   people not to destroy property.  Those are important

20   mitigating factors in your favor.

21          But I hope you also see that when people allow

22   themselves to get swept up into a mob, they end up creating

23   chaos and lawlessness that the vast majority of those people

24   individually never would have caused or chosen to do.  That

25   is the danger of mobs.

 1          Your overall history also gives me pause.  You've

 2    maintained steady employment, which I think counts in your

 3    favor.  And as Mr. Thornley points out, you've done well on

 4    pretrial supervision.  And I do take that into account at

 5    sentencing.

 6          On the other hand, January 6th was the culmination

 7    of a petty crime spree for you.  On December 11, 2020, you

 8    were arrested and later convicted of misdemeanor assault

 9    after you pepper sprayed a restaurant employee.  Weeks

10    later, you toppled a menorah and tore down a Hanukkah sign

11    at the Arizona State Capitol and you were later convicted of

12    criminal damage for that incident.

13          Notably, you livestreamed both of those incidents.

14          In short, you repeatedly engaged in criminality to

15    earn followers and money online.  That is a very disturbing

16    vocation, sir.

17          I have made clear before that I think first-time

18    misdemeanants usually deserve a break.  But you don't fit in

19    that category anymore.  Rather than taking the assault

20    arrest as a wake-up back there in 2020, you just kept going,

21    looking for new ways to earn money by committing crime.  I

22    think this history requires -- also requires a longer term

23    of a court supervision sentence.

24          I've also got to say, I don't see a lot here in

25    terms of remorse.  I appreciate the fact according to the

1    mitigation memorandum that you're no longer livestreaming.

2    I think that's wise.

3          But this was, as I said, a national embarrassment.

4    And while your conduct was by no means the most egregious

5    there on that day, I can't say I see a real recognition from

6    you of the seriousness of what you were involved in and how

7    your specific actions helped exacerbate that situation.

8    There's nothing wrong with expressing your political views.

9    Political rallies and even protests are welcome in this

10   country and in this city.

11         But the first and most important step in being a

12   contributing citizen of our society is upholding the laws of

13   that society.  That's especially important for people like

14   you who have a platform to influence others in our country.

15   It's important that you first and foremost toe the line and

16   lead by example.  You failed to do that on January 6th.

17         Having considered all of the factors laid out in

18   18 USC 3553(a), and cognizant that I must fashion a sentence

19   that is sufficient but not greater than necessary to comply

20   with the purposes of sentencing, I will now impose the

21   sentence:

22         Pursuant to the Sentencing Reform Act of 1984, and

23   in consideration of the provisions of 18 USC 3553(a), it is

24   the judgment of the Court that you, Anthime Gionet, are

25   hereby sentenced to the custody of the Bureau of Prisons for

1    a term of 60 days on Count 1.  You are also sentenced to two

2    years' probation on Count 1.

3         You are further ordered to pay a $2,000 fine, $500

4    in restitution and a $10 special assessment.

5         While on probation, you shall abide by the

6    following mandatory conditions as well as the standard

7    conditions of supervision which are imposed to establish the

8    basic expectations of your conduct while on supervision.

9    The mandatory conditions include:  You must not commit

10   another federal, state or local crime; you must not

11   unlawfully possess a controlled substance, including

12   marijuana; you must refrain from any unlawful use of a

13   controlled substance; you must submit to one drug test

14   within 15 days of placement on supervision and at least two

15   periodic drug tests thereafter as determined by the Court.

16        You must make restitution in accordance with 18

17   USC 3663 and 3663A or any other statute authorizing a

18   sentence of restitution.

19        Restitution payments shall be made to the Clerk of

20   the Court for the U.S. District Court for the District of

21   Columbia for disbursement to the Architect of the Capitol.

22        You shall comply with the following special

23   conditions:  Having assessed your ability to pay, payment of

24   total criminal monetary penalties is due in monthly

25   installments of at least $200 per month to commence 30 days

1    after your release from custody.

2         You must provide the probation officer access to

3    any requested financial information and authorize the

4    release of any financial information.  The probation office

5    may share financial information with the United States

6    Attorney's Office.

7         You must also abide by the discretionary terms of

8    supervision found in Form AO 245-B.

9         Pursuant to 18 USC 3742, you have the right to

10   appeal the sentence imposed by this Court if the period of

11   imprisonment is longer than the statutory maximum.  If you

12   choose to appeal, you must file any appeal within 14 days

13   after the Court enters judgment.

14        As defined in 28 USC 2255, you also have the right

15   to challenge the conviction entered or sentence imposed if

16   new and currently unavailable information becomes available

17   to you or on a claim that you received ineffective

18   assistance of counsel in entering a plea of guilty to the

19   offense of conviction or in connection with sentencing.

20        If you are unable to afford the cost of an appeal,

21   you may request permission from the Court to file an appeal

22   without cost to you.

23        Pursuant to *United States versus Hunter*, 809 F.3d

24   677, from the D.C. Circuit in 2016, are there any objections

25   to the sentence imposed that are not already noted in the

1    record?  Mr. Franks?

2          MR. FRANKS:  No, your Honor.

3          THE COURT:  Mr. Thornley?

4          MR. THORNLEY:  Your Honor, I just wanted to

5    inquire whether or not Mr. Gionet would be given credit for

6    the time that he had served in custody.

7          THE COURT:  Yes.  I think that certainly is my

8    intent.

9          MR. THORNLEY:  Okay.

10          THE COURT:  I will allow him to self-report.

11          There are no counts that need to be dismissed at

12    this point.  Is that right?

13          MR. FRANKS:  No, your Honor.

14          THE COURT:  Anything further, Mr. Franks?

15          MR. FRANKS:  No, your Honor.  Thank you.

16          THE COURT:  Mr. Thornley?

17          MR. THORNLEY:  No, your Honor.

18          THE COURT:  Thank you, gentlemen.

19          THE PROBATION OFFICER:  Your Honor, does the Court

20    have a position on voluntary surrender?

21          THE COURT:  Yes.  I'm sorry.  I did say he can

22    voluntarily surrender.

23          THE PROBATION OFFICER:  Thank you.

24          And does the Court have a position on transfer of

25    jurisdiction?

1          THE COURT:  I want to maintain jurisdiction.

2          THE PROBATION OFFICER:  Thank you, your Honor.

3          THE COURT:  Thanks, folks.

4          MR. THORNLEY:  Thank you, your Honor.

5          (Proceedings concluded.)

**<u>CERTIFICATE</u>**

1

2

3              I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8

9

10             Dated this 26th day of January, 2023.

11

12             <u>/s/ Lisa Edwards, RDR, CRR</u>
               Official Court Reporter
13             United States District Court for the
                 District of Columbia
14             333 Constitution Avenue, Northwest
               Washington, D.C. 20001
15             (202) 354-3269

16

17

18

19

20

21

22

23

24

25